

DA 12-0399

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 93

STATE OF MONTANA,

        Plaintiff and Appellee,

    v.

BRIAN KEITH JENT,

        Defendant and Appellant.


APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Dawson, Cause No. DC-11-075
Honorable Richard A. Simonton, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

            Joseph P. Howard, Attorney at Law, Great Falls, Montana

        For Appellee:

            Timothy C. Fox, Montana Attorney General, C. Mark Fowler, Assistant
Attorney General, Helena, Montana

            Olivia Norlin-Rieger, Dawson County Attorney, Glendive, Montana


Submitted on Briefs:  February 27, 2013

Decided:  April 9, 2013


Filed:


_____
                   Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    Brian Keith Jent pleaded guilty to the aggravated assault of his wife, Nancylee Cadorette.  As part of his sentence, the Seventh Judicial District Court, Dawson County, ordered Jent to pay $44,112.74 in restitution, including $19,866.69 for Cadorette's medical expenses arising from her suicide attempt two and a half months after Jent's assault.  Jent appeals only that portion of his sentence involving the $19,866.69 in restitution.  He claims that Cadorette, in respect to her suicide attempt, cannot be considered a "victim" of his offense for restitution purposes, and that there was no causal connection between his criminal conduct and the medical expenses associated with the suicide attempt.  We affirm the District Court's order of restitution.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    Jent and Cadorette, husband and wife, have what can be characterized as a tumultuous and often violent relationship.  On October 27, 2011, Jent and Cadorette got into a drunken argument.  Jent struck Cadorette in the face, fracturing the orbital wall of her right eye socket.  Cadorette was initially treated at Glendive Medical Center and subsequently underwent surgery in Billings.  Jent also damaged Cadorette's vehicle, television, and computer.

¶3    On November 18, 2011, the State charged Jent with aggravated assault and two counts of felony criminal mischief.  On January 13, 2012, Jent pleaded guilty to aggravated assault pursuant to a plea agreement which recommended a sentence of eight years to the Department of Corrections, with six years suspended, and various conditions, including restitution.  Jent agreed to pay restitution for Cadorette's medical bills in an

amount to be determined prior to sentencing. The State moved to dismiss the criminal mischief counts.

¶4     On the same day that Jent pleaded guilty, Cadorette ingested a bottle of Ambien and two bottles of Crown Royal whiskey. This occurred two days after Cadorette's January 11, 2012 meeting with the prosecutor and defense counsel where the criminal proceedings against Jent were discussed. As a result of her suicide attempt, Cadorette spent the next several days in a behavioral health unit and accumulated medical expenses totaling $19,866.69.

¶5     A probation/parole officer prepared a presentence investigation report (PSI) for sentencing. The Restitution section of the PSI identifies $19,866.69 as "the costs associated with [Cadorette's] medical care due to her mental health issues occurring after the instant offense." Cadorette also prepared an Affidavit of Victim's Pecuniary Loss, which the District Court admitted into evidence over Jent's objection. In addition to other amounts claimed as restitution, which are not at issue in this appeal, the affidavit included the $19,866.69 in medical expenses related to her suicide attempt.

¶6     In the Victim's Impact section of the PSI, the probation/parole officer notes that she spoke with Cadorette on March 5, 2012. Cadorette told the officer that she had attempted suicide on two separate occasions since Jent's offense, the most recent on January 13. Cadorette stated that she had attempted suicide "because she felt guilty about what happened and was blaming herself for the instant offense." Cadorette also stated that she felt Jent's plea agreement with the State was "harsh" and that he "just needs anger treatment." The probation/parole officer reiterated these facts during her testimony

3

at Jent's sentencing hearing. She testified that at their March 5 meeting, Cadorette "voiced a lot of guilty feelings, feelings that she was somehow at fault for this." Cadorette "blamed herself a lot in the instant offense." Jent did not refute the officer's testimony in this regard.

¶7 Cadorette also testified at the sentencing hearing. She explained that her relationship with Jent was "pretty rocky" and often violent, and that two of Jent's prior offenses involved assaults against her. She admitted responsibility for participating in some of the marital disputes. Regarding the instant offense, Cadorette testified that she had not asked Jent to pay her medical expenses arising out of her January 13, 2012 suicide attempt. Nevertheless, she agreed that her suicide attempt was "directly related" to Jent's assault against her eleven weeks earlier, and that her meeting with the prosecutor and defense counsel on January 11 had "drudged up" her memories of the assault. Cadorette further testified that her therapist had reached the conclusion that Cadorette's suicide attempt was "directly correlated" to the assault.

¶8 The District Court sentenced Jent to eight years at the Department of Corrections, with three years suspended. The court ordered Jent to pay $44,112.74 in restitution, including $19,866.69 for Cadorette's medical expenses related to her suicide attempt. Jent now appeals the imposition of the $19,866.69 in restitution.

**STANDARDS OF REVIEW**

¶9 Pursuant to § 46-18-201(5), MCA, if a person has been found guilty of an offense, whether by a verdict of guilty or by a plea of guilty or nolo contendere, and the sentencing judge finds that a "victim" has sustained a "pecuniary loss," as defined in

4

§ 46-18-243, MCA, then the sentencing judge shall, as part of the sentence, require payment of full restitution to the victim, as provided in §§ 46-18-241 through -249, MCA. Such analysis requires the sentencing judge to apply the statutory definitions of "victim" and "pecuniary loss" to the factual circumstances of the case. This constitutes a mixed question of law and fact. *State v. Warclub*, 2005 MT 149, ¶ 21, 327 Mont. 352, 114 P.3d 254 ("mixed questions of law and fact are those in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard" (internal quotation marks omitted)).

¶10 In reviewing such questions on appeal, the sentencing court's factual findings will not be disturbed unless they are clearly erroneous, but whether those facts satisfy the legal standard is reviewed de novo. *Warclub*, ¶ 23; *State v. Weaver*, 2008 MT 86, ¶ 10, 342 Mont. 196, 179 P.3d 534. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with a definite and firm conviction that a mistake has been made. *State v. Breeding*, 2008 MT 162, ¶ 11, 343 Mont. 323, 184 P.3d 313. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance. *Johnston v. Palmer*, 2007 MT 99, ¶ 26, 337 Mont. 101, 158 P.3d 998.

### DISCUSSION

¶11 ***Did the District Court err by requiring Jent to pay restitution for medical expenses arising from Cadorette's suicide attempt?***

5

¶12 As noted, when a criminal defendant pleads guilty to an offense, the sentencing court must impose restitution if the offender's criminal conduct resulted in pecuniary loss to a victim. Section 46-18-201(5), MCA. The restitution must be "full" and to "any victim who has sustained pecuniary loss, including a person suffering an economic loss." Section 46-18-241(1), MCA. Restitution engrafts a civil remedy onto a criminal statute, creating a procedural shortcut for crime victims who would be entitled to a civil recovery against the offender. *State v. Brownback*, 2010 MT 96, ¶ 19, 356 Mont. 190, 232 P.3d 385. This Court has determined that restitution is not to be limited by the definition of the offense or to only those injuries arising as a "direct" result of the offense. *See State v. LaTray*, 2000 MT 262, ¶¶ 12-14, 302 Mont. 11, 11 P.3d 116. The plain language of the restitution statutes "does not limit restitution to victims defined in terms of the offense for which the defendant was convicted or to losses arising directly from the defendant's criminal conduct." *LaTray*, ¶ 12; *see also State v. Ness*, 2009 MT 300, ¶ 20, 352 Mont. 317, 216 P.3d 773.

¶13 The victim, for purposes of restitution, may be any person who suffers loss of property, bodily injury, or death "as a result of" the offender's criminal conduct, and may also include a governmental entity that suffers loss of property "as a result of" the commission of the offense. Section 46-18-243(2)(a)(i), (iii), MCA. Moreover, pecuniary loss includes special damages that a person could recover against the offender in a civil action "arising out of" the offender's criminal activities. Section 46-18-243(1)(a), MCA. It also includes the full replacement cost of property taken, destroyed, harmed, or otherwise devalued "as a result of" the offender's criminal conduct, and future medical

6

expenses that the victim can reasonably be expected to incur "as a result of" the offender's criminal conduct. Section 46-18-243(1)(b), (c), MCA. Thus, a causal relation between the offender's criminal conduct and the pecuniary loss is the touchstone for determining whether a person or entity is a victim entitled to restitution. *City of Billings v. Edward*, 2012 MT 186, ¶ 26, 366 Mont. 107, 285 P.3d 523; *Brownback*, ¶ 20; *Breeding*, ¶ 13. Further, a pecuniary loss may be so attenuated as to no longer be considered "a result of" the offense. *Ness*, ¶ 20; *LaTray*, ¶ 14; *Brownback*, ¶ 20 n. 1.

¶14 In determining Jent's restitution obligation for Cadorette's medical expenses, we must examine the causal relation between his offense of aggravated assault (fracturing the orbital wall of Cadorette's right eye socket) and Cadorette's suicide attempt. Jent maintains that Cadorette's losses were self-inflicted and did not result from his breaking her right orbital socket. Jent thus argues that Cadorette cannot be considered a "victim" for purposes of determining pecuniary loss. Although Jent does not dispute that Cadorette was a victim of his aggravated assault, he argues that she cannot be considered a victim in relation to her own suicide attempt because any losses she suffered were not "as a result of . . . the commission of an offense." Section 46-18-243(2)(a)(i)(A), MCA. Jent's analysis of the meaning of "victim," however, ignores the consideration of a causal connection between his underlying offense and Cadorette's suicide attempt. If such connection is established, the losses sustained by Cadorette were "as a result of" Jent's offense.

¶15 This Court previously examined the nature of the causal connection between an injury and a subsequent suicide in the context of a workers' compensation proceeding. In

7

*Campbell v. Young Motor Co.*, 211 Mont. 68, 70-71, 684 P.2d 1101, 1102 (1984), we refused to recognize suicide as an intentional act that automatically breaks the chain of causation to defeat a claim for death benefits. Favorably quoting a case from Delaware, we stated:

> "In applying this [chain of causation] test, death by suicide would be compensable if it is caused by severe pain and despair which proximately results from a compensable accident, and is of such a degree as to override normal and rational judgment. A suicide committed under such circumstances cannot be said to be 'intentional' even though the act itself may be volitional." [*Delaware Tire Center v. Fox*, 401 A.2d 97, 100 (Del. Super. 1979).] This chain of causation rule recognizes that the injury and the post-injury trauma, mental as well as physical, may take a path anticipated by no one, but nonetheless be traceable to the injury itself.

*Campbell*, 211 Mont. at 72, 684 P.2d at 1103 (first brackets in original, paragraph break omitted).

¶16 Cadorette's suicide attempt occurred on the same day Jent pleaded guilty, and two days after she had discussed the criminal proceedings against Jent with the prosecutor and defense counsel. Cadorette testified that this discussion "drudged up" her feelings about the assault. She felt guilty about what had happened, was blaming herself for Jent's offense, and felt responsible for the harsh penalty she believed Jent was receiving. Given the relatively short timespan of eleven weeks between Jent's criminal conduct and Cadorette's subsequent suicide attempt, it appears that the deterioration in her mental health was related to the events in Jent's criminal proceedings, the nature of the particular offense, and the dynamics of the parties' marital relationship. Most importantly, in response to questioning by the sentencing judge, Cadorette testified that the suicide attempt was "directly related" to Jent's assault upon her. The record supports the District

8

Court's determination that a causal connection exists between Jent's offense and Cadorette's suicide-related medical expenses.

¶17 This conclusion is consistent with our prior decisions regarding an offender's restitution obligation and an asserted attenuated loss. In *State v. Grindheim*, 2004 MT 311, ¶¶ 55-56, 323 Mont. 519, 101 P.3d 267, we affirmed the district court's order that the defendant, who had been found guilty of sexual intercourse without consent, pay the victim's future counseling costs. In *State v. Perkins*, 2009 MT 150, 350 Mont. 387, 208 P.3d 386, we concluded that the childcare costs incurred by P.M. (the child-victim's aunt) were recoverable as restitution because the behavior of the defendant (Perkins) had caused the child (C.C.) to be removed from the mother's home and placed in P.M.'s care. We observed that "Perkins' conduct was the precipitating event in the youth in need of care proceedings that led to removal of C.C. from her mother's home and placement with P.M." *Perkins*, ¶ 10. In *Ness*, the defendant tampered with evidence by washing his vehicle following a hit-and-run accident. We determined that his action of striking the victim with his vehicle created the evidence with which he ultimately tampered. Had he not struck the victim, the charge of tampering with the evidence from that incident would not have arisen. *Ness*, ¶ 16. The victim died from the injuries she received when Ness's vehicle struck her, thus incurring funeral expenses. We held that these expenses resulted from Ness's actions. *Ness*, ¶ 21. Lastly, we held in *LaTray* that towing and ambulance services, which had responded to the scene of the defendant's offense, were entitled to restitution for their expenses. We observed that "Montana's restitution statute does not confine restitution to the amount by which a defendant enriches himself at the victim's

expense but[,] rather, empowers courts to impose restitution for economic loss as a result of the crime." *LaTray*, ¶ 21. We specifically held that "LaTray's criminal acts created a situation in which ambulance and towing services were reasonably necessary for public safety or for the safety of LaTray himself. The expenditures incurred by the ambulance and towing services were a result of LaTray's crime." *LaTray*, ¶ 22.

¶18 In the instant proceeding, Cadorette's suicide attempt is causally related to Jent's action of fracturing her right orbital socket. There is a definite connection between the underlying aggravated assault and Cadorette's mental health. This is reflected not only in the parties' violent and tumultuous marital relationship, which is a factor bearing on the existence of a causal connection in this case, but also in Cadorette's testimony that her suicide attempt was "directly related" to Jent's assault. Jent's conduct created a situation which resulted in medical expenses arising from the compromised mental health of his victim. Accordingly, there is a causal connection between Jent's offense and the restitution requirement for Cadorette's suicide attempt.

¶19 Jent additionally asserts that there was no "nexus or correlation" between his offense and the restitution requirement. We find this argument to be without merit. The nexus requirement is based on our cases interpreting §§ 46-18-201(4) and -202(1), MCA. *See Ness*, ¶¶ 10-11; *City of Bozeman v. Cantu*, 2013 MT 40, ¶ 20, 369 Mont. 81, 296 P.3d 461. Given our conclusion that the medical expenses relating to Cadorette's suicide attempt are causally connected to Jent's underlying offense of aggravated assault, we have little difficulty in also concluding that there is a nexus between Jent's offense and his obligation to pay restitution for those medical expenses. *Cf. Ness*, ¶ 17 ("Restitution

10

for Sherman's funeral expenses has 'some correlation or connection to the underlying offense' for which Ness was sentenced. . . . Thus, there is a nexus or correlation between the crime and the restitution requirement.").

¶20 Finally, Jent argues that Cadorette's medical expenses would not have been recoverable in a civil action against him. He cites § 46-18-243(1)(a), MCA, which defines "pecuniary loss" as "all special damages . . . , *substantiated by evidence in the record*, that a person could recover against the offender in a civil action" (emphasis added). He also relies on § 46-18-244(2), MCA, which states that "[i]n the proceeding for the determination of the amount of restitution, the offender may assert any defense that the offender could raise in a civil action for the loss for which the victim seeks compensation." Jent contends that there was not any substantial evidence demonstrating that his conduct was the "proximate cause" of Cadorette's suicide attempt. He also contends that Cadorette had a duty to mitigate her damages by seeking psychological counseling, rather than attempting suicide.

¶21 Jent had the opportunity to assert mitigation in the District Court. He did not do so, and we will not review that question for the first time on appeal. *State v. Ferguson*, 2005 MT 343, ¶ 38, 330 Mont. 103, 126 P.3d 463. As for Jent's evidentiary argument, the District Court considered Cadorette's Affidavit of Victim's Pecuniary Loss, as permitted by § 46-18-242, MCA. No evidence was presented that would dispute the accuracy or correctness of the amount of medical expenses set forth in the affidavit. The District Court also considered, and accepted, Cadorette's testimony that her suicide attempt was directly related to Jent's instant offense. Given this testimony, as well as

11

Cadorette's feelings of guilt and self-blame arising out of the incident, the timing of her suicide attempt, and the nature of the parties' relationship, we simply are not persuaded by Jent's contention that Cadorette's desperate act was "too far removed" from Jent's assault to have been (as he puts it) "proximately caused" by the assault.

¶22 Based on the foregoing discussion, we hold that the District Court did not err in determining that Cadorette's suicide attempt was "a result of" Jent's criminal conduct. We further conclude that substantial evidence in the record supports the restitution obligation. We thus uphold the District Court's restitution order totaling $44,112.74, which includes $19,866.69 for medical expenses incurred as a result of the suicide attempt.

¶23 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE