FILED

January 7 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 13-0059

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 2

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

ANTHONY MICHAEL CERASANI,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-10-171
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Peter F. Lacny, Datsopoulos, MacDonald & Lind, P.C.,
Missoula, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant
Attorney General, Helena, Montana

            Fred R. Van Valkenburg, Missoula County Attorney, Jennifer Clark,
Deputy County Attorney, Missoula, Montana

Submitted on Briefs:  October 30, 2013
Decided:  January 7, 2014

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    Anthony Cerasani appeals from the District Court's judgment dated November 27, 2012, imposing a restitution obligation of $164,851.27 as a condition of a deferred sentence for the offense of felony theft.  We affirm in part and reverse in part.

¶2    The issue on appeal is whether the District Court properly included restitution for the victims' tax liability as part of the amount Cerasani is required to repay.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3    In 2007 Linda and Gerald Cintron hired Cerasani to build a house for them and the cost exceeded their original budget by $100,000.  In January 2008 Cerasani proposed that the Cintrons invest in a subdivision project that he said could double their investment and also allow them to pay off their debt on the new house.  Cerasani proposed that they buy three 5-acre lots from him for a total of $480,000, with a down payment of $180,000.  According to Cerasani's own expert who testified at the restitution hearing, Cerasani represented to the Cintrons that they "could make a 50% return in a short time" by re-selling the lots.  The Cintrons decided to accept the deal based upon Cerasani's projections of large profits.  Cerasani also represented that he owned the land and showed the Cintrons a warranty deed that transferred the property to him.

¶4    The Cintrons raised the $180,000 down payment by cashing out all of their life savings retirement accounts that they had paid into for 25 years.  While the Cintrons knew there would be tax consequences for them as a result of cashing out their retirement accounts, Cerasani's promises of large profits assured them that they could cover any tax

liability. Because of the early-withdrawal tax consequences, they had to cash out substantially more from their retirement accounts than the $180,000 they gave to Cerasani in order to net the $180,000 for the land deal. In addition to income tax on the withdrawals, the Cintrons had to pay a federal excise tax on the "early distribution" that Cerasani's expert calculated to be $21,366. The financial institutions withheld this amount from the distribution that the Cintrons took.

¶5 The Cintrons gave Cerasani $180,000 and a promissory note for the balance of the purchase price. The Cintrons never received title to the land, and after investigation determined that Cerasani had title to the lots only briefly and had transferred title to a third party within minutes of when the property had been deeded to him. When confronted with the facts Cerasani made various excuses and claimed that he had deeded their property to a third person as a matter of routine real estate practices. The Cintrons told Cerasani that they needed either their money or the property to pay the substantial tax bill that arose from cashing out their retirement accounts. Despite promises to the contrary, Cerasani did not refund the Cintrons' money or transfer any property to them.

¶6 In early 2009 the Cintrons reported the incident to law enforcement, and in April 2010 the State charged Cerasani with felony theft by deception. After the theft charge was filed Cerasani returned $50,000 of the Cintrons' $180,000 investment. Cerasani and the State then entered a deferred prosecution agreement in which he promised to pay the Cintrons an additional $75,000 immediately, and to make additional payments totaling slightly over $145,000 within 15 months. He paid the $75,000 but did not pay the

remaining $145,000.[1]  Because Cerasani failed to complete the deferred prosecution agreement, the State re-opened the felony theft case.  In June 2012 Cerasani signed a plea agreement.  He agreed to enter a no contest plea to the felony theft charge in return for a six-year deferred sentence and a restitution obligation to be determined by the District Court.

¶7      The District Court held the restitution hearing in October 2012.  Linda Cintron testified that they would never have withdrawn their retirement money if Cerasani had not shown them deeds to the lots, represented that he owned the property, and told them that they would make a substantial profit.  She testified that they had to pay a penalty for withdrawing the retirement money before they were old enough to do so, and then had to pay taxes on the retirement money as ordinary income.  The Cintrons acknowledged that they were aware of the tax consequences of cashing out their retirement accounts but believed that they could make more than enough profit on the land deal to cover the tax liability.  The Cintrons had a total tax liability in 2008 of $96,000, largely due to using the retirement funds to participate in Cerasani's land deal.

¶8      Other tax consequences arose.  After it became clear that they would suffer a loss of their down payment money, the Cintrons consulted a tax attorney who advised them to claim a $180,000 loss due to theft.  They filed an amended 2008 tax return claiming a theft loss, and instead of owing substantial taxes for that year, they received a refund.

[1] In the deferred prosecution agreement Cerasani agreed to pay the Cintrons slightly over $270,000, including the $50,000 he paid them when he was initially charged, but that agreement was abrogated by Cerasani's failure to comply with the payment requirements.

4

After Cerasani paid back $50,000 and then $75,000 they paid taxes on those amounts as ordinary income.

¶9 At the restitution hearing Cerasani presented the expert testimony of an accountant who opined that Cerasani should not be liable for any of the tax consequences that arose from the Cintrons' use of their retirement accounts. He testified that "reasonable investing standards don't contemplate where the money comes from." He asserted that the Cintrons should bear the full tax burden of their decision to use their retirement money, and Cerasani should be liable only to return the $180,000 he actually received from them, plus interest. Cerasani's expert agreed, however, that the Cintrons would not have owed the taxes that arose from the withdrawal of their retirement accounts but for Cerasani's land deal.

¶10 The District Court ordered that Cerasani repay the $180,000 investment, less the $125,000 he had already repaid. The District Court also ordered that Cerasani pay interest of $17,617.27 on the investment money; that he pay $3,280 in attorney fees the Cintrons incurred in addressing their tax liability; and that he pay a net of $88,964 representing the Cintrons' tax liability arising from their use of the retirement accounts, including the excise tax. The total restitution amount was set at $164,861.27. Cerasani appeals.

**STANDARD OF REVIEW**

¶11 When considering the requirement of restitution to a crime victim who has suffered pecuniary loss the sentencing judge applies the statutes to the facts of the case. *State v. Jent*, 2013 MT 93, ¶ 9, 369 Mont. 468, 299 P.3d 332. Upon appeal, we review

5

such mixed questions of law and fact de novo. *State v. Warclub*, 2005 MT 149, ¶ 21, 327 Mont. 352, 114 P.3d 254. A district court's findings of fact will be upheld unless they are clearly erroneous, and the issue of whether the facts meet the applicable legal standard is reviewed de novo to determine whether it was correct. *Jent*, ¶ 10.

## DISCUSSION

¶12 Under Montana law a sentencing court "shall, as part of the sentence, require payment of full restitution to the victim." Section 46-18-201(5), MCA. An offender must "make full restitution to any victim who has sustained pecuniary loss, including a person suffering an economic loss." Section 46-18-241(1), MCA. In addition, district courts have broad discretion in fashioning criminal sentences, and may impose any condition reasonably related to the objectives of rehabilitation or the protection of the victim or society. Sections 46-18-201 and -202, MCA. A condition of a sentence will be upheld as long as there is a nexus either to the offense or to the offender. *State v. Cantu*, 2013 MT 40, ¶ 20, 369 Mont. 81, 296 P.3d 461.

¶13 Montana law broadly provides that a crime victim is entitled to "full" restitution from an offender for economic loss. Section 46-18-241(1), MCA. The extent of the restitution obligation is not limited to the defined elements of the offense and is not limited to losses that arise as a "direct" result of the offense. *State v. LaTray*, 2000 MT 262, ¶¶ 12-14, 302 Mont. 11, 11 P.3d 116. Restitution is not limited to the amount by which an offender enriched himself at the victim's expense, but includes all economic loss that resulted from the crime. *LaTray*, ¶ 21. Recoverable loss also includes the "full replacement cost of property taken, destroyed, harmed or otherwise devalued as a result

6

of the offender's criminal conduct." Section 46-18-243(1)(b), MCA. Recoverable pecuniary loss includes "all special damages" that a person could recover against the offender in a civil action, § 46-18-243(1)(a), MCA, and a causal relationship between the offender's conduct and the victim's loss is the "touchstone" for determining the entitlement to restitution. *Jent,* ¶ 13.

¶14 In numerous cases this Court has upheld a restitution obligation where there is a causal connection between the offense and another person's expense or loss. *Jent,* ¶ 22 (defendant convicted of aggravated assault required to pay for medical expenses arising from victim's later suicide attempt); *State v. Ness,* 2009 MT 300, ¶ 21, 352 Mont. 317, 216 P.3d 773 (defendant convicted of tampering with evidence required to pay for funeral expenses of person who died in the underlying accident); *State v. Perkins,* 2009 MT 150, ¶¶ 11-12, 350 Mont. 387, 208 P.3d 386 (defendant convicted of felony criminal endangerment required to pay for day care expenses that arose because the child victim was removed from the mother's home and placed with an aunt); and *State v. Grindheim,* 2004 MT 311, ¶¶ 55-56, 323 Mont. 519, 101 P.3d 267 (defendant convicted of sexual intercourse without consent required to pay victim's future counseling costs).

¶15 Cerasani does not contest that the Cintrons are victims who have sustained pecuniary loss and who are entitled to restitution. He contests only the amount of the restitution.[2] In this case Cerasani argues that since the Cintrons chose to use their retirement accounts as the source of the money that he stole from them, he should not be

---

[2] Cerasani initially argued that the Cintrons failed to mitigate their losses, but he subsequently withdrew that contention as an issue on appeal.

7

responsible for the resulting tax consequences. The Cintrons were the victims of crime and lost a substantial amount of money as a direct result of that crime. It is clear from the testimony at the restitution hearing that *but for* Cerasani's crime the Cintrons would not have withdrawn their retirement savings in 2008.

¶16 There is therefore sufficient connection between Cerasani's crime and the Cintrons' loss to support the requirement that he pay restitution. *Jent,* ¶ 14 (where there is a causal connection between the offense and a subsequent loss, then the loss was a legal result of the offense). Moreover, that connection satisfies any requirement that there be a "nexus or correlation" between the offense and the restitution requirement. *Jent*, ¶ 19. To the extent that the restitution is measured by civil law obligations, § 46-18-243(1), MCA, the facts here support the civil law conclusion that but for Cerasani's crime the Cintrons would not have suffered the loss. *Perkins,* ¶ 11 (a causal "but for" connection between the crime and the loss is sufficient to demonstrate that the loss could have been recovered in a civil action).

¶17 Cerasani contends that he should not be liable for the Cintrons' tax liabilities because they would have had to eventually pay taxes on the money after they began withdrawing it for retirement income. The parties agree that the Citrons' retirement savings would have been taxed as ordinary income when they withdrew it for retirement income in the future.

¶18 The Cintrons have been exposed to two tax consequences arising from withdrawal of their retirement accounts. The first is that they are subject to pay income tax on the withdrawn funds. While this tax obligation initially arose on their 2008 tax return, they

8

filed an amended return and claimed a theft loss of the $180,000 in that year. Consequently they avoided the large income tax liability in 2008, but will incur income tax liability on any part of the $180,000 that they recover. That includes paying income tax on the two restitution amounts (totaling $125,000) that Cerasani has paid so far. When Cerasani makes additional restitution for the balance of the $180,000 the Cintrons will be subject to income tax on that amount as well.

¶19    We agree with Cerasani that he should not be required to make restitution for the income tax liabilities that the Cintrons have faced or will face when they receive restitution for the $180,000 because they were subject to that tax liability with or without Cerasani's crime. The Cintrons would be subject to income tax on that amount whether or not Cerasani had ever proposed the land deal. As tax-deferred contributions, the amount was subject to taxation whenever they withdrew the money.

¶20    The second tax consequence is the excise tax that the Cintrons had to pay when they withdrew the retirement money. According to Cerasani's own expert, that amount was $21,366. However, the excise tax is a liability they would not have faced but for the early withdrawal to participate in Cerasani's land deal. Therefore, Cerasani may be required to pay restitution of the $21,366 excise tax.

¶21    Cerasani also contests the District Court's consideration of the approximately $3,000 in attorney fees that the Cintrons incurred to obtain advice about dealing with the tax consequences of his crime. This is clearly a proper consideration for restitution. *LaTray*, ¶ 21 (expenses incurred by a victim to "address and rectify" the effects of

criminal conduct are a result of the crime and are properly the subject of a restitution order).

¶22 It is clear from the facts that the Cintrons suffered a pecuniary loss as a direct result of Cerasani's crime, without which that loss would not have occurred. That loss included the amount of money the Cintrons gave directly to Cerasani; the excise tax consequences to the Cintrons arising from the early withdrawal of their money; and the amount they spent on legal advice to address the consequence of the crime. The District Court properly considered these items of loss when considering restitution. However, Cerasani should not be liable for the Cintron's other income tax obligations. To that extent, the District Court is reversed and this matter is remanded for entry of a new restitution order in conformity with this Opinion.

/S/ MIKE McGRATH

We Concur:

/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE

10