DA 20-0166

FILED

06/28/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0166

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 122N

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

KYLE ALEXANDER HAMM,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
                  In and For the County of Lewis and Clark, Cause No. ADC 18-176
                  Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Tammy A. Hinderman, Assistant
            Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Helena, Montana

            C. Mark Fowler, Attorney at Law, Tumwater, Washington

            Leo Gallagher, Lewis and Clark County Attorney, Helena, Montana

                        Submitted on Briefs:  May 11, 2022

                                   Decided:  June 28, 2022

Filed:

                    _____
                              Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Appellant Kyle Alexander Hamm (Hamm) appeals his convictions on two counts of deliberate homicide, which were entered in the First Judicial District Court, Lewis and Clark County. Hamm also appeals the District Court's corresponding restitution award of $35,592 to one of the victim's sisters. We affirm.

¶3 On the night of March 18, 2018, Hamm rode with Kaleb Taylor (Kaleb) and Journey Wienke (Wienke) in Kaleb's truck to the home of Kaleb's parents—David and Charla Taylor (the Taylors)—in the Helena Valley. According to the record, Hamm allegedly waited outside in Kaleb's truck as the trio's lookout/getaway driver while Kaleb and Wienke entered the Taylors' home to rob them. During the course of the robbery, Kaleb and Wienke murdered the Taylors.[1] Forensic evidence demonstrated that the Taylors died in their home that night due to a combination of stab wounds from a knife blade and blunt force trauma consistent with the use of a metal pipe. Wienke also helped Kaleb steal expensive jewelry from the Taylor's master bedroom. Following these events, Kaleb and

---

[1] While testifying as a witness at Hamm's September 2019 trial, Kaleb stated that he formed the intent to kill his parents only "a couple seconds" before the murders occurred.

Wienke were driven away from the scene by Hamm, who drove the trio to the "Rods-N-Dogs" car wash in Helena. Surveillance video from the car wash captured the men's activities and identified Hamm as the driver of the vehicle. Kaleb and Wienke proceeded to use the car wash to wash off their clothes, shoes, and the murder weapons. Video evidence also revealed that Hamm used his foot to push a bloody knife blade down the car wash's floor drain after Wienke accidentally dropped the knife blade. After visiting the car wash, the men continued to drive around Helena and disposed of items related to the homicides and robbery in scattered locations. Security footage from Drae's casino in East Helena also confirmed that the three men were together on that night.

¶4 Shortly thereafter, all three men were arrested by police. Upon his arrest, Hamm was also found to be in possession of methamphetamine, marijuana, and drug paraphernalia.

¶5 During interviews with police—and later, as a witness at Hamm's trial—Kaleb admitted to robbing and murdering both of his parents with the assistance of Wienke and Hamm on the night of March 18, 2018. Kaleb also worked with police to help recover the evidence that the trio had hidden around Helena, including the metal pipe that was used to attack the Taylors as well as the stolen jewelry. Kaleb pleaded guilty to two counts of deliberate homicide. Separate trials were held for Hamm and Wienke. Wienke's jury convicted him on two counts of deliberate homicide.

¶6 Hamm was also charged with two counts of deliberate homicide—specifically, felony murder—under § 45-5-102(1)(b), MCA. Hamm was also charged with one count

3

of tampering with evidence, one count of drug possession, and one count of possession of drug paraphernalia. Hamm pleaded not guilty to all charges. Hamm's jury trial was held in September of 2019. At the trial, testimony from Kaleb and video surveillance footage identified Hamm as Kaleb and Wienke's 'getaway driver' on the night of March 18, 2018.

¶7 Prior to jury deliberations, the court provided the jury with the following relevant instructions regarding Hamm's charges under § 45-5-102(1)(b), MCA ("Deliberate homicide") and § 45-2-302, MCA, ("When accountability exists"):

> A person commits the offense of deliberate homicide, if the person commits or is legally accountable for the commission of the offense of robbery, and in the course of the robbery or flight thereafter, the person or any person legally accountable for the crime causes the death of another human being.
>
> .  .  .
>
> To convict the Defendant of deliberate homicide by being legally accountable for the conduct of another person, the State must prove the following elements:
>     1. That the crime of [r]obbery, as defined in [a separate jury instruction] has been committed; and
>     2. that the Defendant, Kyle Hamm, either before or during the commission of the offense of robbery, and with the purpose to promote or facilitate such commission, solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.
>
> .  .  .
>
> A person is legally accountable for the conduct of another when either before or during the commission of an offense, and with the purpose to promote or facilitate such commission, the person solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.

¶8 On October 7, 2019, the jury convicted Hamm of both counts of deliberate homicide, tampering with physical evidence, criminal possession of dangerous drugs, and criminal possession of drug paraphernalia.

4

¶9 On December 27, 2019, prior to Hamm's sentencing, Rita Cortright (Cortright), the sister of homicide victim Charla Taylor (Charla), filed an Affidavit of Pecuniary Loss (Cortright's affidavit) requesting restitution from Hamm to compensate her for specific financial losses that resulted from her sister's murder. Prior to Charla's death, Charla ran the Lincoln Road R.V. Park in Helena. Cortright's affidavit asserted that, to prevent Charla's estate from defaulting after her death, Cortright was forced to take over the day-to-day operations of the R.V. park from April 2018 through March 2019. According to her affidavit, Cortright funded these operations out-of-pocket, resulting in an asserted total loss of $33,222. Cortright's affidavit also indicated that she was forced to sell her sister's home in order to pay off her sister's estate debt. In doing so, Cortright incurred a $2,370 bill from a home cleaning service that had cleaned Charla's home prior to its sale. The combination of Cortright's two claims for special damages resulted in a total restitution claim of $35,592 against Hamm.

¶10 In January 2020, Hamm was sentenced to 80 years in prison for each count of deliberate homicide, 10 years for tampering, 5 years for drug possession, and 180 days for drug paraphernalia possession, with all sentences to run concurrently. The court also ordered Hamm to pay restitution to Cortright in the amount of $35,592, plus a 10% administrative fee, resulting in a total payment of $39,151.20. Hamm objected to the restitution amount, arguing that the evidence supporting "the financial information regarding the R.V. park [in Cortright's affidavit] . . . is not complete." The court overruled Hamm's objection but gave him "90 days to challenge [the] restitution [award]" and

5

indicated it would hold a post-sentencing evidentiary hearing on the issue of restitution if Hamm so desired. However, Hamm opted not to exercise this prescribed challenge and instead filed his appeal with this Court.

¶11 Hamm now appeals his conviction and sentence on four separate counts. First, Hamm argues that the State did not present sufficient evidence to support his two felony murder convictions under § 45-5-102(1)(b), MCA. Second, Hamm contends that this Court should exercise plain error review and order a new trial based on the District Court's failure to issue a jury instruction informing the jury that "a person who commits all the elements of an offense cannot be legally accountable for that same offense." Third, in the alternative, Hamm alleges that his attorneys' representation constituted ineffective assistance of counsel (IAC) due to their failure to request the aforementioned jury instruction. Lastly, Hamm alleges that the District Court imposed an illegal restitution award.

¶12 Hamm's first contention asserts that there was not sufficient evidence to support his convictions for felony murder. This Court conducts de novo review of whether sufficient evidence supports a conviction. *State v. Daniels*, 2019 MT 214, ¶ 27, 397 Mont. 204, 448 P.3d 511 (citation omitted). There is sufficient evidence to support a conviction if, "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Daniels*, ¶ 27 (quoting *State v. Polak*, 2018 MT 174, ¶ 34, 392 Mont. 90, 422 P.3d 112). Under this standard, Hamm fails to show that no rational trier of fact could have found Hamm guilty of felony murder—largely because the arguments in Hamm's appeal are

6

based on a misapplication of the Montana statutes governing "legal accountability" and felony murder.

¶13 Section 45-2-302(2)-(3), MCA, provides that a criminal defendant is "legally accountable" for the crime of another individual when either "the statute defining the offense makes the person accountable" or, "before or during the commission of an offense[,] with the purpose to promote or facilitate the commission, the [defendant] solicits, aids, abets, agrees, or attempts to aid the other [individual] in the planning or commission of the offense." Next, under Montana's felony murder statute, a defendant is guilty of felony murder if he (1) "attempts to commit, commits, or is *legally accountable* for the attempt or commission of robbery" and (2) "in the course of the [robbery] or flight thereafter, the [defendant] or any person *legally accountable* for the crime causes the death of another human being." Section 45-5-102(1)(b), MCA (emphasis added). Hamm does not dispute that the first element of felony murder was met; indeed, Hamm concedes that Kaleb and Wienke personally committed the crime of robbery and does not contest that he was Kaleb and Wienke's getaway driver. Instead, Hamm argues the State did not establish the second element of felony murder for two reasons—neither of which holds up to scrutiny.

¶14 Hamm first argues that, under the second element of § 45-5-102(1)(b), MCA, "no reasonable jury could have found . . . that [Hamm] caused the Taylor's deaths" because "[t]he State did not present any evidence that [Hamm] *personally* caused the deaths of the Taylors" (emphasis added). However, this argument fails as we have held "Montana's

7

felony[]murder statute" works by "provid[ing] notice to such an individual that, should he or she choose to participate in a serious felony, and should someone be killed, the felon will be subject to criminal liability for deliberate homicide." *State v. Burkhart*, 2004 MT 372, ¶ 45, 325 Mont. 27, 103 P.3d 1037 (discussing § 45-5-102(1)(b), MCA). Here, the "serious felony" was the robbery of the Taylor's home, and the Taylors were murdered during commission of that robbery. Indeed, under § 45-5-102(1)(b), MCA, liability exists even when the 'getaway driver' does not end the victim's life by his own hand because the getaway was part of the crime. Video evidence and witness testimony identified Hamm as Kaleb and Wienke's getaway driver on the night of March 18, 2018. As a result, a reasonable jury could infer that Hamm was accountable for the Taylors' deaths under § 45-5-102(1)(b), MCA. The fact that Hamm did not personally bludgeon or stab the Taylors himself has no bearing on his liability for the crime of felony murder.

¶15 Hamm continues, however, and implies that he can only be found guilty of felony murder if, during the course of the robbery, "any [other] person *legally accountable* for the crime [of robbery] causes the death of another human being." According to Hamm's argument, because Kaleb and Wienke both "personally" committed "every element" of the crime of robbery, the two men are "personal[ly] . . . accountable"—but not "legally accountable"—for the crime of robbery. Under this logic, Hamm argues he cannot be convicted under the language of Montana's felony murder statute. Although linguistically clever, Hamm's argument leads to an unreasonable interpretation of Montana's felony murder statute which contravenes our precedent. *See, e.g., Burkhart*, ¶ 45. As result,

8

Hamm's contention that the State did not present sufficient evidence to support his conviction under § 45-5-102(1)(b), MCA, fails.

¶16   Hamm's second argument on appeal contends that, even if this Court concludes sufficient evidence existed for Hamm's felony murder convictions, the jury instructions given at Hamm's trial were deficient.  Importantly, Hamm notes his assertion of error was not raised before the trial court, and he therefore asks this Court to exercise plain error review.  *See State v. Birthmark*, 2013 MT 86, ¶¶ 11, 20-21, 369 Mont. 413, 300 P.3d 1140 (holding that if a defendant had the opportunity to object to a jury instruction at trial but failed to do so, we will not examine the issue unless it qualifies for plain error review).  According to our precedent, "[p]lain error review is used sparingly and only in situations that implicate a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process."  *Birthmark*, ¶ 11 (citation omitted).  Conversely, if application of the plain error doctrine is unwarranted, this Court "need not address the merits of the alleged error."  *State v. Stutzman*, 2017 MT 169, ¶ 23, 388 Mont. 133, 398 P.3d 265 (citations omitted).

¶17   Hamm specifically asserts that the jury should have been instructed "that a person who commits every element of an offense and therefore personally commits the offense cannot, as a matter of law, be legally accountable for that offense."  However, Hamm's assertion that the jury should have been instructed with this language is based on the same defective reading of § 45-5-102(1)(b), MCA, upon which Hamm based his failed insufficiency of the evidence argument.  Because this Court has already rejected this

9

interpretation of § 45-5-102(1)(b), MCA, Hamm's requested jury instruction does not "implicate a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Birthmark*, ¶ 11. As a result, we decline to exercise plain error review on this issue.

¶18 Third, Hamm asserts that his trial counsels' failure to request this jury instruction constituted IAC. However, Hamm's third contention also fails. Under the first prong of the governing test for IAC claims, a client must demonstrate that the actions of their counsel or counsels were deficient or "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 2064 (1984); *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095 (citing *Strickland*'s test for IAC claims). Hamm's assertion fails this first prong, as we have already held that the interpretation of § 45-5-102(1)(b), MCA, that Hamm advances on appeal is without merit. Moreover, Hamm's appeal cites no precedent which would allow us to conclude that a reasonably competent attorney is required to request a jury instruction based on a speculative—and, ultimately, incorrect—theory of statutory interpretation. Instead, federal precedent points this Court toward the opposite conclusion. *See Knowles v. Mirzayance*, 556 U.S. 111, 121-22, 129 S. Ct. 1411, 1419 (2009) (holding that the fact that an attorney has "nothing to lose" by setting forth a legal theory at trial is not nearly enough to constitute a valid IAC claim based on the attorney's failure to offer that theory). We conclude Hamm's counsel was not deficient for failing to request Hamm's proposed jury instruction.

¶19 Hamm's fourth argument asserts that, in the event this Court upholds his two convictions for felony murder, the lower court nevertheless erred by awarding restitution of $35,592 to Cortright to account for losses that Cortright suffered as a result of her sister's death. However, Hamm's arguments fail, as the restitution ordered by the District Court was in full compliance with the relevant statutes and case law surrounding restitution awards.

¶20 Section 46-18-201(5), MCA, provides that restitution must be awarded to a "victim" of a felony; specifically, if "the sentencing judge finds that a victim . . . has sustained a pecuniary loss, the sentencing judge shall, as part of the sentence, require payment of full restitution to the victim[.]" Section 46-18-243(1), MCA, provides a broad definition of the "pecuniary loss[es]" that are recoverable via restitution:

> 'Pecuniary loss' means . . . all special damages, but not general damages, substantiated by evidence in the record, that a person could recover against the offender in a civil action arising out of the facts or events constituting the offender's criminal activities, including without limitation out-of-pocket losses, such as medical expenses, loss of income, expenses reasonably incurred in obtaining ordinary and necessary services that the victim would have performed if not injured, expenses reasonably incurred in attending court proceedings related to the commission of the offense, and reasonable expenses related to funeral and burial or crematory services[.]

Section 46-18-243(2)(a), MCA, defines "victim[s]" who may recover pecuniary losses to include "the estate of a deceased or incapacitated victim or a member of the immediate family of a homicide victim." In Hamm's case, Cortright is the sister of homicide victim Carla Taylor, making Cortright a lawful "victim" for restitution purposes. Next, according to Cortright's affidavit, she requested restitution to recover the damages that she personally

incurred after being forced to sell her deceased sister's home and take over the day-to-day operations of her sister's R.V. park business from April 2018 through March 2019—actions which Cortright specifically undertook to pay off the debts owed by her sister's estate. Under § 46-18-243(1), MCA's definition, these damages easily constitute the types of "pecuniary loss[es]" which may rightfully be recovered as restitution, and the District Court did not err by awarding $35,592 in restitution to Cortright.

¶21 Nevertheless, Hamm raises multiple arguments challenging the validity of Cortright's restitution award, each of which fails. First, Hamm claims that the loss calculations presented in Cortright's affidavit, without the presentation of any additional evidence and/or supporting financial statements, were too imprecise for restitution to be properly awarded. However, our prior holdings indicate that, by itself, a "victim's sworn affidavit explaining the amount of loss is ordinarily sufficient to support an order of restitution." *State v. Aragorn*, 2014 MT 89, ¶ 20, 374 Mont. 391, 321 P.3d 841 (citing *State v. Jent*, 2013 MT 93, ¶ 21, 369 Mont. 468, 299 P.3d 332). Indeed, we have held that "documentation supporting [an affidavit's] claimed loss is not generally required" absent the presentation of evidence or testimony which conflicts with the content of the affidavit. *Aragorn*, ¶ 20. Hamm's argument before this Court, along with his objection to Cortright's affidavit during his sentencing hearing, rests solely on the assertion that the calculations in Cortright's affidavit are imprecise and not "specific" enough. Yet, pursuant to both *Aragorn*, ¶ 20, and *Jent*, ¶ 21, Hamm failed to present any evidence that rebutted Cortright's affidavit. Furthermore, at Hamm's sentencing hearing, the District Court

provided Hamm the opportunity to present evidence to rebut calculations in Cortright's affidavit at a "restitution hearing . . . at a future date," which the court would hold within "90 days" of Hamm's sentencing hearing if Hamm wished to "challenge" the court's restitution award.[2]  However, rather than accept the District Court's proposal for a post-sentencing evidentiary hearing on the matter, Hamm declined the opportunity and, instead, filed his appeal directly with this Court.  As a result, Hamm has failed to rebut Cortright's affidavit.  We hold that Cortright's affidavit alone was a sufficient basis for awarding restitution.

¶22    Hamm also asserts that the awarded restitution was "illegal because the court concluded Cortright's affidavit of pecuniary loss was insufficient[,] yet ordered restitution anyway."  In support of this contention, Hamm points to the court's comment during his sentencing that the R.V. park losses asserted in Cortright's affidavit could potentially be "flesh[ed] out a bit."  However, this statement by the District Court can hardly be said to constitute a full-blown rebuke of the sufficiency of Cortright's affidavit; instead, the Court ultimately affirmed the sufficiency of Cortright's affidavit when it ordered Hamm to pay Cortright's requested amount of $35,592 in restitution at the close of Hamm's sentencing hearing.  This Court's precedent also makes clear that calculations in restitution affidavits may lawfully incorporate "some guess work" by the victim, and this guesswork does not

---

[2] Hamm asserts on appeal that the District Court's offer to hold this post-sentencing "restitution hearing" constitutes reversible procedural error.  However, any alleged procedural error by the District Court was ultimately harmless, as we hold that Cortright's affidavit alone was a sufficient basis for the court's restitution award.  Ultimately, Hamm was presented the opportunity to have a subsequent restitution hearing and chose not to avail himself of one.

necessarily render an affidavit unsubstantiated. *State v. Benoit*, 2002 MT 166, ¶ 30, 310 Mont. 449, 51 P.3d 495.

¶23 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶24 Affirmed.

/S/ LAURIE McKINNON

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR