FILED

04/08/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0393

DA 23-0393

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 70

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JUSTIN DEAN KALINA,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 20-1474
Honorable Donald Harris, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Jami Rebsom, Jami Rebsom Law Firm, PLLC, Livingston, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

      Scott Twito, Yellowstone County Attorney, Billings, Montana

                Submitted on Briefs:  March 5, 2025

                         Decided:  April 8, 2025

Filed:

                _____
                         Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Justin Dean Kalina appeals from the Thirteenth Judicial District Court, Yellowstone County's July 18, 2023 Judgment. On November 3, 2022, a jury convicted Kalina of Violation of a Protective Order – Second Offense, Assault with a Weapon, and Tampering with Witnesses and Informants.

¶2 We restate the issues on appeal as follows:

*Issue 1: Whether sufficient evidence existed to sustain Kalina's conviction for Assault with a Weapon.*

*Issue 2: Whether the District Court abused its discretion when it declined to instruct the jury on the defense of Use of Force in Defense of an Occupied Structure.*

*Issue 3: Whether the District Court abused its discretion when it allowed the State to present evidence of Kalina's past convictions.*

*Issue 4: Whether the District Court erred when it declined to hold certain evidentiary hearings.*

*Issue 5: Whether the District Court erred by rejecting Kalina's motion to enforce the State's pretrial plea offer.*

*Issue 6: Whether the District Court imposed a "trial tax" when it sentenced Kalina.*

*Issue 7: Whether Kalina's trial counsel provided ineffective assistance.*

*Issue 8: Whether the District Court erred by denying Kalina's second motion for a new trial.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Because the facts giving rise to Kalina's conviction were heavily contested at trial, and Kalina filed several post-trial motions pertaining to pre-trial events, it is easiest to

2

understand what happened by breaking the narrative up by offenses and filings rather than telling the story strictly chronologically.

### Violation of a Protective Order – Second Offense

¶4    In late 2019, Kalina's former girlfriend Kim Field received an order of protection requiring Kalina to remain 1500 feet from her at all times.  That order of protection was still in effect the night of October 27, 2020, when Kalina walked into the Stadium Club bar.  Field and her friend Stacy Butts were already at the Stadium Club when Kalina arrived.  There was conflicting testimony at trial as to what happened next, but it is uncontested that Kalina approached Field and Stacy and attempted to engage them in conversation.  Field then told Kalina to leave, reminding him of the order of protection. Kalina left the bar at that point.

### Assault with a Weapon

¶5    Stacy testified that he left the Stadium Club shortly after Kalina and went directly home because he was worried that Kalina, who had previously sent Stacy a threatening picture of Stacy's house, would go there after the interaction at the bar.  Stacy testified that his wife, two children, Mike Butts (Stacy's brother), and Mike's friend Ted Vezina were all at Stacy's house on the evening in question.  Mike and Vezina were in Stacy's open garage processing a deer when Stacy arrived.  Stacy was describing the interaction at the bar to Mike and explaining that he was worried that Kalina might show up at the house when Kalina arrived.

¶6    Stacy and Kalina gave differing accounts as to what happened next. Stacy testified that Kalina pulled up in front of his driveway and refused to leave in spite of Stacy's repeated commands that Kalina get away from his house. Frustrated by Kalina's lack of response, Stacy reached through the open window of Kalina's vehicle and pushed his head. Kalina drove further down the street, and Stacy stepped out into the road to verify that Kalina was leaving. Kalina reversed his vehicle towards Stacy so quickly that Stacy had to jump out of the way. Kalina then again drove forward to the end of the street. Kalina exited his vehicle and motioned for Stacy to meet him at the end of the street. Stacy walked over to Kalina alone, cursing, and hit Kalina with his elbow. Stacy then heard a sound "like a zipper being pulled up" and found himself on the ground with blood on his hands. Stacy walked back to his house where he learned that Kalina had cut his face open to the skull from his forehead through his mouth. The wound ultimately required multiple treatments and left Stacy with a scar and numbness in his face. Mike and Vezina both testified at trial and largely corroborated Stacy's version of events.

¶7    Kalina testified that, after he left the bar, he picked up his friend, Jessica Foote, to drive her to a mutual friend's house. Kalina testified that he had only been to the mutual friend's house a few times before and did not recall exactly how to get there. Kalina testified that, coincidentally, the friend's house was off of the same street as Stacy's. Kalina testified that he got lost and turned down Stacy's street by mistake. Kalina testified that Foote told him that someone on the side of the road was flagging him down, so he stopped. Kalina testified that he rolled his window down to see who had waived him down,

4

heard Stacy tell someone to get a gun, and that Stacy immediately started "striking" him through the open window. Kalina testified that his key fob fell out of his ignition, and he was unable to start his car to leave while Stacy was striking him for some time. Once he got the car started again, he quickly drove to the end of the street. Kalina testified that while he was stopped at the intersection and waiting for other cars to pass, he looked over his shoulder and saw Stacy running towards the car. He testified that he was worried for Foote's safety, so he stepped out of the car and told Stacy to stop. Kalina testified that Stacy did not stop, and when he reached Kalina he began striking Kalina repeatedly. Kalina testified that Mike and Vezina then approached the vehicle and tried to enter it. Kalina testified that he was afraid Mike and Vezina would join the fight, and that he would be seriously injured or killed, so he drew his "twine cutter" and slashed Stacy's face. He testified that he did not carry the three-quarter inch twine cutter for self-defense and had "never been in an encounter" like the fight before. He testified that he left shortly thereafter.

¶8     The State sought to question Kalina on cross-examination about his prior convictions for assault. Kalina's trial counsel objected, but the District Court overruled the objection, holding that Kalina had "opened the door to his prior convictions" by testifying that he had "never been in an encounter" like the fight. The State asked Kalina about his three prior assault convictions and confirmed that he had been in "multiple situations where assaults were occurring."

5

¶9     The State asked Kalina about a call he made to Lieutenant Shane Shelden of the Billings Police Department on October 29, 2020.[1]  Kalina testified that he had made several calls to law enforcement regarding the incident between October 27, 2020, and the call to Lieutenant Shelden.  In each of those calls, he testified that he told law enforcement that he would only talk about the incident with counsel present.  However, in the call with Lieutenant Shelden, Kalina discussed the incident in detail without counsel.  Kalina's account to Lieutenant Shelden largely mirrored the one he later provided at trial.

¶10     Lieutenant Shelden testified at trial that he did not initially know what the call was regarding, but as Kalina spoke he recognized the incident Kalina was describing and began recording the call.  Towards the end of the call, Lieutenant Shelden asked Kalina whether he had any weapons on him during the October 27, 2020 altercation.  Kalina said that he did not.

¶11     Kalina moved to suppress the statements he made during the call with Lieutenant Shelden based on alleged violations of his Sixth Amendment right to counsel and his Fifth Amendment right to a *Miranda* warning before interrogation by law enforcement.  In his motion, Kalina requested a suppression hearing "if necessary."  The District Court denied the motion without a hearing, ruling that "Kalina's motion fail[ed] to set forth any alleged facts which, if true, would show that his October 29, 2020 statement . . . was involuntary."

---

[1] The parties dispute whether Kalina called Lieutenant Shelden or Kalina had left a message with the Lieutenant and the Lieutenant called him back.  The record is unclear as to this point, but Kalina does not challenge the validity of the District Court's decision to admit evidence relating to the call, only its decision not to hold a hearing on his motion to suppress.  Therefore, it is irrelevant for the purposes of this appeal who initiated the call.

¶12 Kalina moved to dismiss the Assault with a Weapon charge, alleging that the State's information did not establish probable cause. Kalina alleged that the State had omitted "very relevant and important facts in its possession" regarding Stacy "being the aggressor." Kalina asserted that if the State had included these material facts in its information, it would have been clear that Kalina's use of force was justifiable, eliminating probable cause to believe that he had committed the alleged crime. In his motion, Kalina requested a hearing on his claims. The District Court denied his motion without a hearing, holding that whether Kalina's use of force was justified was "for the jury to decide."

¶13 Foote testified at trial. She testified that she was in Kalina's vehicle during the incident, but that she did not feel threatened at the time, she never heard anyone mention guns, and no one attempted to enter the vehicle. On cross-examination, Kalina's counsel attempted to impeach Foote by asking her whether she had texted someone on the night of the incident that she had seen someone with a gun. Kalina's counsel then showed Foote a copy of a text message he claimed she had sent, but Foote testified that she did not recall sending it. Kalina's counsel also asked whether Foote had ever sent a text message to Kalina "telling him that [she] wanted [to be] more than friends." Kalina's counsel once again showed Foote a copy of a text message he claimed she had sent, and she once again did not recall sending such a message. Kalina's counsel did not seek to enter the messages into evidence.

¶14 Kalina's proposed jury instructions on the defense of Use of Force in Defense of an Occupied Structure based on the argument that Kalina had cut Stacy in defense of Foote

7

sitting in the passenger seat of Kalina's car. The State objected to these instructions, arguing that Kalina's car did not meet the definition of an occupied structure. The District Court agreed and declined to instruct the jury on Use of Force in Defense of an Occupied Structure. The District Court did instruct the jury on Use of Force in Defense of a Person.

**Tampering with Witnesses and Informants**

¶15 Foote testified at trial that, sometime after the incident, Kalina instructed her to prepare a statement about the incident to provide to his attorney. She testified that Kalina told her what to put in the statement so that it would match his story and made edits to a draft that she emailed to him. In addition to providing the statement to Kalina's attorney, Foote forwarded the draft with Kalina's edits to Lieutenant Shelden, along with a description of how Kalina had edited the statement.

**Post-Trial Motions**

¶16 After a four-day trial, the jury convicted Kalina of all three charges on November 3, 2022. On December 5, 2022, Kalina moved for a new trial; his motion did not include a request for a hearing. The District Court denied Kalina's motion without a hearing on May 15, 2023.

¶17 On February 10, 2023, Kalina's trial counsel moved to withdraw based on a complaint the Yellowstone County Sheriff's Office had filed against him. Trial counsel asserted that the complaint, which was later dismissed, would limit his ability to "effectively argue" on Kalina's behalf. The District Court allowed Kalina's trial counsel

8

to withdraw on March 3, 2023, and ordered the Montana State Office of the Public Defender to assign Kalina new counsel.

¶18 On June 12, 2023, Kalina's newly assigned post-trial counsel moved to enforce a prior plea agreement offer made by the State. On October 19, 2022, the State had offered Kalina a plea agreement in which he would plead guilty to Felony Criminal Endangerment and Violation of a Protective Order – Second Offense, and the State would dismiss the remaining charges and recommend a sentence of five years, all suspended. Kalina's trial counsel initially responded positively to the offer and proposed to involve the District Court in the agreement pursuant to § 46-12-211(1)(b), MCA, so that it would be binding on all parties. The parties emailed the District Court's law clerk to schedule a conference call to discuss the District Court's involvement, but that evening Kalina's trial counsel emailed the State stating that "[a]fter a lengthy meeting with [Kalina] . . . he's decided to make [a] counteroffer." The State responded the next morning that it was not open to Kalina's counteroffer, and that if Kalina was rejecting the State's initial offer, it would proceed to trial. Kalina's counsel emailed the District Court's law clerk, copying the State, to "advise the Court that [Kalina had] rejected the State's offer."

¶19 On June 19, 2023, the District Court held a sentencing hearing at which Kalina's post-trial counsel argued in favor of the motion to enforce the plea agreement. Responding to Kalina's argument, the District Court stated "I was a trial lawyer for 35 years. I never hold it against anybody who asserts their right to trial. That's a fact. That ought to be done more often." On July 18, 2023, the District Court denied Kalina's motion to enforce the

9

plea agreement, finding that it was "undisputed that Kalina rejected the State's plea offer," so "no plea agreement was reached" that could be enforced. The same day, the District Court entered a Judgment sentencing Kalina to 20 years in the Montana State Prison, with 8 years suspended, a 5-year suspended sentence to run consecutively, and a 6-month sentence to run concurrently.

¶20 On March 6, 2024, while this appeal was pending and almost a year and a half after his conviction, Kalina moved a second time for a new trial arguing that the clerk failed to comply with § 3-15-405, MCA, in assembling the jury panel for his case. We stayed Kalina's appeal on March 19, 2024, pending the resolution of Kalina's motion.

¶21 The State responded to Kalina's motion on April 8, 2024, and attached an affidavit from Yellowstone County Deputy Jury Clerk Bernie Wahl. Wahl described the process by which Kalina's jury had been selected as follows: In May of 2022, the Supreme Court Administrator's office sent Wahl a list of names qualified to serve as jurors in Yellowstone County between September 1, 2022, and August 31, 2023. Wahl imported those names into the State's Jury Program, which generated a random list of 25,000 potential jurors. Wahl sent questionnaires to those potential jurors, of which 1,906 were deemed undeliverable and 13,610 were not returned. An additional 492 were returned and deemed temporarily excused under §§ 3-15-312 and -313, MCA, leaving 9,500 deemed "Available with Questionnaire." Wahl did not make any further attempts to contact those potential jurors who did not return their questionnaires. Instead, she randomly drew 125 names from the "Available with Questionnaire" pool for Kalina's trial.

10

¶22     On August 26, 2024, the District Court denied Kalina's motion.  The District Court held that Kalina's motion was untimely under §§ 46-16-112 and -702, MCA, and that the clerk had substantially complied with the requirements of § 3-15-405, MCA.

**DISCUSSION**

¶23     *Issue 1: Whether sufficient evidence existed to sustain Kalina's conviction for Assault with a Weapon.*

¶24     Kalina argues that there was insufficient evidence at trial to support the jury's verdict that he was guilty of Assault with a Weapon.  He argues that he successfully presented a defense of Use of Force in Defense of a Person, and the State did not present sufficient evidence to meet its  burden that his actions were unreasonable.

¶25     We review the sufficiency of the evidence to sustain a guilty verdict in a criminal case to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *State v. Sattler*, 1998 MT 57, ¶ 56, 288 Mont. 79, 956 P.2d 54.  We review a jury's verdict to determine whether sufficient evidence exists to support it, not whether the evidence could have supported a different result.  *State v. Spottedbear*, 2016 MT 243, ¶ 8, 385 Mont. 68, 380 P.3d 810.  It is within the province of the jury to weigh the evidence based on the credibility of the witnesses and determine which version of events should prevail.  *Spottedbear*, ¶ 8.

¶26     Use of Force in Defense of a Person is an affirmative defense pursuant to § 45-3-115, MCA.  A "person is justified in the use of force likely to cause death or serious bodily harm only if the person reasonably believes that the force is necessary to prevent

11

imminent death or serious bodily harm to the person or another or to prevent the commission of a forcible felony." Section 45-3-102, MCA. When a criminal defendant has offered evidence of justifiable use of force, the effect is to create for the State an additional burden of "proving beyond a reasonable doubt that the defendant's actions were not justified." Section 46-16-131, MCA.

¶27 Because it is undisputed that Stacy struck Kalina first through the window of Kalina's parked car, Kalina asserts he was justified when he cut Stacy's face through to the skull. What Kalina leaves out of his argument is that after Stacy struck Kalina, it is undisputed that Kalina drove to the end of the street. There was conflicting testimony about what happened next, but, viewing the evidence in the light most favorable to the prosecution, a rational juror could have chosen to credit Stacy's account and disbelieve Kalina's. By Stacy's account, rather than turning onto the next street and leaving the scene entirely, Kalina chose to exit his vehicle and beckon Stacy over to him. For the use of force that causes serious bodily harm to be justified, the user must reasonably believe that serious bodily harm to him or another is "imminent." We have held that "imminent" in this context "depends on the reasonableness of the circumstances." *State v. Daniels*, 210 Mont. 1, 23, 682 P.2d 173, 182 (1984). Once Kalina demonstrated that he had the opportunity to avoid the attack by driving away and instead chose to invite his assailant to come closer, a rational juror could have determined that the risk of bodily harm to him or Foote was no longer "imminent" and, therefore, his decision to cut Stacy's face was not justified.

12

¶28 *Issue 2: Whether the District Court abused its discretion when it declined to instruct the jury on the defense of Use of Force in Defense of an Occupied Structure.*

¶29 Kalina argues that he was entitled to a jury instruction on the defense of Use of Force in Defense of an Occupied Structure and that the District Court abused its discretion when it declined to provide one. The State responds that the District Court correctly determined that Kalina had not presented sufficient evidence to support such an instruction.

¶30 We review a district court's decisions regarding jury instructions for an abuse of discretion. *State v. Fredericks*, 2024 MT 226, ¶ 11, 418 Mont. 220, 557 P.3d 32. Our review considers "whether the instructions, taken as a whole, fully and fairly instructed the jury on the law applicable to the case." *Fredericks*, ¶ 11 (quoting *State v. Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 429, 204 P.3d 7). A district court's mistake regarding jury instructions constitutes reversible error only if it prejudicially affects the defendant's substantive rights. *Fredericks*, ¶ 11.

¶31 A defendant is entitled to a jury instruction on Use of Force in Defense of an Occupied Structure if he or she presents sufficient evidence at trial to meet the elements of § 45-3-103, MCA. *See* § 46-16-131, MCA; *State v. Marquez*, 2021 MT 263, ¶ 17, 406 Mont. 9, 496 P.3d 963 (collecting citations). One of those elements is that the assailant attempted an "unlawful entry into or attack upon an occupied structure." Section 45-3-103(1), MCA. An "occupied structure" is defined as "any building, vehicle, or other place suitable for human occupancy or night lodging of persons or for carrying on business." Section 45-2-101(47), MCA. Because the definition includes vehicles, Kalina

13

asserts that his car constitutes an occupied structure. But we held in *State v. Bashor*, 188 Mont. 397, 424, 614 P.2d 470, 485 (1980), that a vehicle is not an occupied structure unless there is evidence that it is "equipped for human occupancy or night lodging." Because nothing in Kalina's description of his car suggested that it was equipped or used for occupancy, the District Court did not abuse its discretion when it rejected his Use of Force in Defense of an Occupied Structure instruction.

¶32     *Issue 3: Whether the District Court abused its discretion when it allowed the State to present evidence of Kalina's past convictions.*

¶33     Kalina argues that the District Court abused its discretion when it allowed the State to present evidence of his past convictions for assault because M. R. Evid. 404(b) prohibits the admission of past acts.[2] The State responds that it was permitted to question Kalina about his prior assault convictions because his testimony on direct examination "opened the door" to the line of questioning.

¶34     A trial court has broad discretion in determining the admissibility of evidence, so we review a trial court's evidentiary rulings for an abuse of discretion. *Spottedbear*, ¶ 9. In exercising its discretion, however, the trial court is bound by the Rules of Evidence, so, to the extent that the court's ruling is based on an interpretation of an evidentiary rule, our review is de novo. *Spottedbear*, ¶ 9.

---

[2] Kalina also argues in his reply brief that the State similarly should not have been permitted under Rule 404(b) to present evidence of his past protective order violations or past GPS monitoring. M. R. App. P. 12(3) requires a reply brief to "be confined to new matter raised in the brief of the [A]ppellee." Kalina's argument does not comply with Rule 12(3); we therefore decline to address Kalina's evidentiary arguments beyond those that apply to evidence of his prior assault convictions.

14

¶35    Generally, "[a]ll relevant evidence is admissible" unless otherwise provided by law. M. R. Evid. 402.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  M. R. Evid. 401.  M. R. Evid. 404(b), however, places a limitation on the admission of otherwise relevant evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith."  Nevertheless, "a defendant may, by opening statement or elicited witness testimony, further 'open the door' to cross-examination or extrinsic evidence regarding otherwise inadmissible [prior] acts evidence which then becomes relevant for the purpose of explaining or correcting a pertinent false impression or assertion."  *State v. McGhee*, 2021 MT 193, ¶ 21, 405 Mont. 121, 492 P.3d 518 (collecting citations).

¶36    In *McGhee*, the defendant, McGhee, testified on direct examination that he "had always had a good relationship with his daughters," who were the victims of his indecent exposure.  *McGhee*, ¶ 25.  We held that the State was entitled to ask McGhee on cross-examination about prior allegations that he had done "something inappropriate with [his] daughters" to dispel the impression that McGhee had intended to give to the jury "that he had always been a loving and caring father."  *McGhee*, ¶¶ 25-26.

¶37    Kalina asserted on direct examination that he had "never been in an encounter" like the fight between him and Stacy before.  The District Court found that Kalina had made those statements to give the jury the impression that he had never been in a violent encounter.  The attempt to give that impression opened the door to the State to

15

cross-examine Kalina on his prior assault convictions to dispel this false impression. The District Court did not abuse its discretion when it permitted the State to do so.

¶38 *Issue 4: Whether the District Court erred when it declined to hold certain evidentiary hearings.*

¶39 Kalina argues that the District Court erred when it declined to hold three separate evidentiary hearings: (1) on his motion to dismiss his Assault with a Weapon charge; (2) on his motion to suppress the evidence relating to his call with Lieutenant Shelden; and (3) on his post-trial motion for a new trial.

¶40 We generally review a district court's denial of an evidentiary hearing for a clear abuse of discretion. *State v. Schulke*, 2005 MT 77, ¶ 10, 326 Mont. 390, 109 P.3d 744. However, a district court's determination whether a statutorily or constitutionally mandated evidentiary hearing is required is a legal question that we review de novo. *Schulke*, ¶ 28.

*1. Kalina's Motion to Dismiss*

¶41 Kalina argues that the District Court was required to hold an evidentiary hearing on his motion to dismiss his Assault with a Weapon charge for a lack of probable cause under the United States Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978). That case held that "the Fourth Amendment [to the United States Constitution] requires that a hearing be held at the defendant's request" if the defendant "makes a substantial preliminary showing that a false statement . . . was included by the affiant in [a search warrant] affidavit." *Franks*, 438 U.S. at 155, 98 S. Ct. at 2676. We adopted the *Franks* procedure for assessing the validity of search warrants, *State v. Sykes*,

16

194 Mont. 14, 20, 663 P.2d 691, 695 (1983), *overruled on other grounds by State v. Long*, 216 Mont. 65, 69, 700 P.2d 153, 156 (1985), but, as Kalina acknowledges, we have never applied the *Franks* procedure to motions to dismiss for lack of probable cause.

¶42    Kalina urges us to extend the *Franks* procedure to cover his motion to dismiss, citing cases from other states that have done so.  We have already declined to extend the *Franks* procedure to new contexts where the defendant has not met the requirements for a *Franks* hearing.  *See Ford v. Mont. First Jud. Dist. Ct.*, No. OP 23-0195, 412 Mont. 550, 530 P.3d 1269 (Apr. 4, 2023) ("[O]ur review of the record Ford has submitted convinces us that Ford would not, as a matter of law, have been entitled to a *Franks* hearing, regardless of the basis for the District Court's ruling.  Thus we will not disturb that ruling via supervisory control.").

¶43    The State is not required to include facts in the information that are relevant to a defendant's potential affirmative defenses; it need only include those facts sufficient to support probable cause that the elements of the offense alleged are met.  *State v. Dunfee*, 2005 MT 147, ¶¶ 33-34, 327 Mont. 335, 114 P.3d 217.  Kalina's motion to dismiss was based on allegations that the affidavit used to support the information intentionally excluded facts that would have made clear that his actions constituted Justifiable Use of Force.  Justifiable Use of Force is an affirmative defense.  Because the State was not required to include facts relevant to a potential Justifiable Use of Force defense in the information, Kalina did not make a substantial preliminary showing that the affidavit contained a false statement that would have entitled him to a *Franks* hearing.  We,

17

therefore, decline to address Kalina's argument that *Franks* should be extended to apply to motions to dismiss. The District Court did not err when it denied Kalina's request for a hearing on his motion to dismiss.

*2. Kalina's Motion to Suppress*

¶44 Kalina argues that the District Court was required to hold an evidentiary hearing on his motion to suppress evidence of his call with Lieutenant Shelden under § 46-13-302, MCA. Section 46-13-302(2), MCA, provides that if a motion to suppress "states facts that, if true, would show that the evidence should be suppressed, the court shall hear the merits of the motion" at a hearing. An evidentiary hearing is not required when the facts are uncontested, and the court need only decide a question of law. *Schulke*, ¶ 28. The District Court held that "Kalina's motion fail[ed] to set forth any alleged facts which, if true, would show that his October 29, 2020 statement . . . was involuntary." On appeal, Kalina fails to point to any disputed facts the District Court overlooked in reaching that holding. The District Court did not err when it declined to hold an evidentiary hearing on Kalina's motion to suppress.

*3. Kalina's Motion for a New Trial*

¶45 Kalina argues that the District Court was required to hold an evidentiary hearing on his motion for a new trial, citing §§ 46-13-301, -302, and -16-702, MCA. Sections 46-13-301, and -302, MCA, apply to suppression of evidence, not a District Court's determination on whether to grant a new trial. Section 46-16-702, MCA, governs motions for a new trial, but we have consistently held that § 46-16-702, MCA, does not include a

requirement that a district court hold an evidentiary hearing. *State v. Geren*, 2012 MT 307, ¶ 30, 367 Mont. 437, 291 P.3d 1144 (collecting citations). Because the statutes Kalina cites do not require a hearing on a motion for a new trial, and Kalina does not raise any other argument that the District Court abused its discretion by not holding one, the District Court did not err by not holding a hearing on Kalina's motion for a new trial.

¶46    *Issue 5: Whether the District Court erred by rejecting Kalina's motion to enforce the State's pretrial plea offer.*

¶47    Kalina argues that the District Court should have enforced the State's pretrial plea offer because the State did not revoke the offer before Kalina accepted it. The State responds that Kalina rejected the offer and presented a counteroffer, which took the State's offer off the table.

¶48    A plea agreement is a contract between the State and a defendant subject to contract law standards. *Maldonado v. State*, 2008 MT 253, ¶ 14, 345 Mont. 69, 190 P.3d 1043. Whether or not a contract exists is a combined issue of law and fact that we review de novo. *Maldonado*, ¶ 14.

¶49    Four elements are essential to the existence of a contract: (1) identifiable parties capable of contracting, (2) consent, (3) a lawful object, and (4) a sufficient cause or consideration. Section 28-2-102, MCA. Parties usually provide consent in the form of an offer and an acceptance. *Olsen v. Johnston*, 2013 MT 25, ¶ 12, 368 Mont. 347, 301 P.3d 791. When, instead of accepting, an offeree rejects an offer, the offeree cannot later revive the contract via acceptance. *Patterson v. Verizon Wireless*, 2005 MT 261, ¶ 11, 329 Mont. 79, 122 P.3d 1193; *see also State v. Killam*, 2005 MT 255, ¶ 18, 329 Mont. 50, 122 P.3d

19

439 ("If a defendant rejects a plea offer, the prosecutor may proceed with the case and make any legal sentencing recommendation because no agreement to the contrary has been reached."). Counteroffers with terms varying from those of the initial offer constitute rejections. *Patterson*, ¶ 11.

¶50 On the evening of October 19, 2022, Kalina's trial counsel emailed the State with a counteroffer to the plea offer the State had made that morning. Even if the legal ramifications of Kalina's counteroffer were unclear, Kalina's counsel emailed the District Court the next day and copied the State, stating that "[Kalina had] rejected the State's offer." Having rejected the State's offer not once but twice, Kalina was not entitled to later hold the State to the terms of its offer. The District Court did not err when it rejected Kalina's attempt to do so.

¶51 *Issue 6: Whether the District Court imposed a "trial tax" when it sentenced Kalina.*

¶52 Kalina argues that the District Court violated his constitutional due process rights by imposing a sentence longer than the one proposed by the State in its pre-trial plea agreement offer. The State responds that the District Court was not involved in the plea-bargaining process and did not consider Kalina's decision to exercise his trial right in its sentencing decision.

¶53 We review a district court's sentence for legality, confining our review to whether the sentence falls within the parameters set by statute. *State v. English*, 2006 MT 177, ¶ 55, 333 Mont. 23, 140 P.3d 454.

20

¶54 "[A] sentencing court which becomes involved in the plea bargaining process, and which imposes a harsher sentence after trial than was offered in exchange for a guilty plea, must specifically point out the factors that justify the increased sentence." *State v. Baldwin*, 192 Mont. 521, 527-28, 629 P.2d 222, 226 (1981). In *Baldwin*, the district court sent a letter to defense counsel sua sponte stating that it would give the defendant a sentence of 5 years, all but 45 days suspended, if the defendant pled guilty. *Baldwin*, 192 Mont. at 523, 629 P.2d at 224. The defendant chose to go to trial and was convicted. *Baldwin*, 192 Mont. at 524, 629 P.2d at 224. The district court sentenced him to 15 years imprisonment with five years suspended, citing only facts that it had at its disposal when it sent the letter. *Baldwin*, 192 Mont. at 522-23, 629 P.2d at 223-24.

¶55 At the outset, Kalina asserts that the District Court was involved in the plea-bargaining process but points only to emails between counsel and the District Court's law clerk setting up an appointment to discuss the proposed agreement. Nothing in the record suggests that such a meeting ever took place. A district court's disputed presence at a meeting scheduled to secure its signature on a deal the parties had initiated is a far cry from a court's decision to send a letter unbidden to defense counsel strongly suggesting that a defendant plead guilty.

¶56 But even assuming that the District Court was involved, it went out of its way to explain its sentence. It pointed to Kalina's testimony at trial that he had knowingly violated the order of protection, which led to the fight. It identified Kalina as a violent and serious repeat offender and acknowledged that the sentencing policy of Montana under

21

§ 46-18-101(3)(e), MCA, was that he be incarcerated. It stated that it was disregarding any of Kalina's prior charges that were dismissed, but that it was troubled by the evidence entered at trial regarding his prior assault convictions. It closed by saying "I was a trial lawyer for 35 years. I never hold it against anybody who asserts their right to trial. That's a fact. That ought to be done more often." In light of the District Court's, at most, minimal alleged involvement and its thorough explanation for the sentence imposed, we do not conclude that the District Court imposed a trial tax as Kalina contends.

¶57    *Issue 7: Whether Kalina's trial counsel provided ineffective assistance.*

¶58    Kalina asserts that his trial counsel provided ineffective assistance in three instances: (1) when he rejected the State's plea agreement offer, (2) when he failed to enter Foote's text messages into evidence, and (3) when he failed to withdraw immediately after a complaint was filed against him. The State responds that the record is insufficient for us to rule on these claims.

¶59    Ineffective assistance of counsel claims are mixed questions of law and fact, which we review de novo. *State v. Sawyer*, 2019 MT 93, ¶ 10, 395 Mont. 309, 439 P.3d 931.

¶60    Defendants have the right to effective assistance of counsel in criminal prosecutions under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24, of the Montana Constitution. *Sawyer*, ¶ 13. To determine whether there was constitutionally ineffective assistance of counsel, we apply the two-prong test adopted by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The test requires the defendant to prove (1) that counsel's

22

performance was deficient, and (2) that counsel's deficient performance prejudiced the defense. *State v. Robinson*, 2009 MT 170, ¶ 28, 350 Mont. 493, 208 P.3d 851. To determine whether counsel's performance was deficient, we must determine "whether counsel's conduct fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances." *Robinson*, ¶ 28 (quoting *Whitlow v. State*, 2008 MT 140, ¶ 20, 343 Mont. 90, 183 P.3d 861).

¶61     When considering whether to review an ineffective assistance of counsel claim on direct appeal, we first must determine whether the claim is based on the trial record. *Sawyer*, ¶ 13. The record "must adequately document a challenged act or omission of defense counsel for the defendant to raise an ineffective assistance claim on direct appeal." *Sawyer*, ¶ 13 (quoting *Soraich v. State*, 2002 MT 187, ¶ 21, 311 Mont. 90, 53 P.3d 878). We will address an ineffective assistance of counsel claim on appeal only "[i]f the record on appeal explains why counsel did not do something." *Sawyer*, ¶ 13 (quoting *Robinson*, ¶ 29). Claims based on matters outside the record are properly raised in a petition for postconviction relief. *Sawyer*, ¶ 13.

¶62     Kalina's claims pertaining to Foote's messages and the timing of his counsel's withdrawal are not properly before us because there is no evidence in the record to explain why trial counsel made those decisions. While trial counsel did question Foote about the discrepancies between her alleged messages and her testimony, counsel made no attempt to enter them as exhibits and moved on to a different line of questioning. Similarly, while we know trial counsel's motivation for his withdrawal, nothing in his motion indicates why

23

he chose to file at that particular time other than his assertion that he was not aware of the complaint against him until shortly before doing so. Because the record on appeal does not explain "why counsel did not do" the things Kalina asserts he should have, Kalina's claims of ineffective assistance are not susceptible to review on direct appeal.

¶63 Kalina's claim regarding his trial counsel's rejection of the plea agreement offer fails because his trial counsel acted reasonably under prong one of the *Strickland* analysis. Kalina does not argue that he received deficient advice from his counsel regarding the offer or misunderstood the negotiations; he argues only that his counsel "rejected a favorable plea offer, when Mr. Kalina only intended to make a counteroffer."[3] As we explained above, a counteroffer in the plea negotiation context constitutes a rejection, so it was reasonable of Kalina's trial counsel to notify the District Court that, having proposed a counteroffer, Kalina had rejected the State's initial offer. This is particularly true where, as the record indicates and Kalina concedes, trial counsel's counteroffer came "[a]fter a lengthy meeting with [Kalina]." Kalina's trial counsel did not provide ineffective assistance when he followed his client's instructions to propose a counteroffer after a lengthy discussion.

¶64 *Issue 8: Whether the District Court erred by denying Kalina's second motion for a new trial.*

---

[3] Kalina argues in his reply brief that his trial counsel's representation was also deficient because he failed to accept the plea agreement Kalina asserts the State left open after his counteroffer. As this argument is raised for the first time in the reply brief, we decline to address it.

¶65    Kalina argues that the District Court erred by denying his second motion for a new trial because the clerk's failure to certify a list of potential jurors who did not return a questionnaire to the sheriff for personal service was a structural error requiring a new trial.[4] The State responds that Kalina's motion was untimely and that the clerk's failure to certify non-responsive jurors was not structural because the jury selection process substantially complied with the statutory requirements.

¶66    We review for abuse of discretion a district court's denial of a motion for a new trial. *State v. Hillious*, 2025 MT 53, ¶ 13, ___ Mont. ___, ___ P.3d ___. We review de novo a trial court's interpretation of the Sixth Amendment to the United States Constitution. *Hillious*, ¶ 13.

¶67    Montana's jury selection statutes contemplate a jury drawn from a fair cross-section of the community because a "fair cross-section requirement [is] fundamental to the jury trial guaranteed by the Sixth Amendment" and Article II, Section 24, of the Montana Constitution. *Hillious,* ¶ 15. "The requirement of a fair cross-section, however, does not guarantee that juries be 'of any particular composition,' or that 'venires . . . [be] a substantially true mirror of the community.'" *Hillious,* ¶ 15 (quoting *United States v. Royal*, 174 F.3d 1, 11 (1st Cir. 1999)). All that is required is that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude

---

[4] Kalina also argues that the District Court was required to hold an evidentiary hearing on his motion. To support his argument, Kalina cites to the same statutes we determined above did not require the District Court to hold a hearing on his first motion for a new trial. For the same reasons, the District Court did not abuse its discretion when it declined to hold a hearing on Kalina's second motion for a new trial.

distinctive groups in the community and thereby fail to be reasonably representative thereof." *Hillious,* ¶ 15 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S. Ct. 692, 703 (1975)).

¶68 Montana's jury selection statutes direct the clerk of court to "serve notice by mail on the persons drawn as jurors and require the persons to respond by mail as to their qualifications to serve as jurors." Section 3-15-405, MCA. If a person does not respond, the clerk is directed to "certify the failure to the sheriff, who shall serve the notice personally on the person." Section 3-15-405, MCA. However, we are not required to "reverse every case where a violation occurs in the statutory process governing the formation of a trial jury." *Hillious,* ¶ 17 (quoting *State v. LaMere*, 2000 MT 45, ¶ 55, 298 Mont. 358, 2 P.3d 204). Rather, we utilize a "substantial compliance" standard, that is, a statutory violation in the jury selection process only warrants reversal if the lack of compliance affects the randomness and objectivity of the jury pool selection. *Hillious,* ¶ 17 (citing *LaMere*, ¶¶ 55-56).

¶69 *Hillious* concerned a materially identical violation of § 3-15-405, MCA, to the one at issue in this case. In *Hillious*, the clerk of court failed to certify the list of non-responsive potential jurors to the sheriff and selected Hillious's jury at random from only those potential jurors who had responded to the jury questionnaire. *Hillious*, ¶¶ 8-11. Hillious argued that the clerk's failure to comply with the requirements of § 3-15-405, MCA, violated his right to a fair and impartial jury. Applying our precedents, we held that the

26

clerk had substantially complied with § 3-15-405, MCA, and that Hillious had not demonstrated any prejudice to his right to an impartial jury. *Hillious*, ¶¶ 30-31.

¶70 Kalina does not make any arguments beyond those made in *Hillious*, nor does he point to any facts that would distinguish his case from that one. Therefore, for the same reasons as in *Hillious*, we hold that the District Court did not err when it denied Kalina's second motion for a new trial.

## CONCLUSION

¶71 The District Court's July 18, 2023 Judgment is affirmed.


/S/ JAMES JEREMIAH SHEA


We Concur:

/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ JIM RICE


Justice Ingrid Gustafson, concurring.

¶72 While I concur with this Court's opinion, I write to express the basis of my concurrence as to issue 8. The Court affirms the District Court's denial of Kalina's second motion for a new trial based primarily on the holding in *Hillious*, in which this Court determined that the jury formation process employed, which is materially identical to that asserted herein, substantially complied with Montana's jury formation statutes and did not constitute any constitutional or statutory violation. I dissented in *Hillious* and continue to

believe the legal analysis set forth in the dissent should be employed.  That said, *Hillious* and its legal analysis now control as stare decisis.  As such, I concur with the Court's opinion on all issues.

/S/ INGRID GUSTAFSON