FILED

09/16/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0147

DA 23-0147

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 209

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

ALEXANDER GARRETT LAFORGE III,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 20-0765
Honorable Donald L. Harris, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Tammy A. Hinderman, Appellate Defender Division Administrator,
Gregory Hood, Assistant Appellate Defender, Helena, Montana

       For Appellee:

           Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

           Scott D. Twito, Yellowstone County Attorney, Hallie Bishop, Deputy
County Attorney, Billings, Montana

Submitted on Briefs:  June 11, 2025

Decided:  September 16, 2025

Filed:

_____
               Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Defendant and Appellant Alexander Garrett LaForge III (LaForge) appeals from the June 28, 2022 Judgment issued by the Thirteenth Judicial District Court, Yellowstone County. The District Court's Judgment followed LaForge's conviction for Deliberate Homicide following an October 4-7, 2021 jury trial.

¶2 We address the following restated issues on appeal:

1. *Whether the District Court abused its discretion by denying LaForge's request for substitution of counsel.*

2. *Whether the District Court abused its discretion in instructing the jury regarding a co-defendant's testimony.*

3. *Whether the District Court erred when it ordered $72,000 in restitution to the victim's mother for loss of profits to her husband's business.*

¶3 We affirm in part, reverse in part, and remand for a hearing to determine the proper amount of restitution.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On April 23, 2020, Jackie Medicine Horse and Dana Bastian bought methamphetamine from Brett Ness. They first met at the Bubble Bath Car Wash, but wanted more methamphetamine than Brett had on him, so ultimately the three went back to his trailer home on Florine Lane in Billings to complete the deal. Brett's roommate, Joseph Miller, was working at the shop near the trailer and saw parts of the transaction. The next day, Jackie messaged Dana that she believed she had not received all the drugs she paid for, threatened to call Dana's probation officer, and told Dana "[c]ollector is going to see your dude[.]" On April 26, 2020, Kristy Alden was driving with Jackie, LaForge,

2

and Cassie Bird In Ground, LaForge's girlfriend. Jackie and LaForge told Kristy to drive to Brett's trailer on Florine Lane because Dana owed her money and they believed she lived there. When they arrived, Brett and his girlfriend, Malea Orser, were in the driveway and about to leave. Kristy pulled her car into the driveway, blocking Brett and Malea from leaving, and Jackie and LaForge got out to confront Brett—demanding to know where Dana was and complaining about how Jackie was allegedly shorted $400 in the meth deal. Brett told them Dana did not live there and to get off of his property. After briefly arguing with Jackie and LaForge, Brett went inside of his trailer. Malea attempted to calm things down while Brett was gone, getting Jackie's name and telling Jackie she would contact her on Facebook if she came across Dana. Brett then came back out of his trailer with an assault rifle. Brett pointed the gun at LaForge and told him to "[g]et the fuck off my property." In response, LaForge told Malea, "[y]ou better move, bitch, because I'm going to be back here and it ain't going to be fucking pretty," before telling Brett, "[y]ou don't aim a gun at somebody you don't fucking intend to kill." LaForge and Jackie then got back into Kristy's car and drove away.

¶5      After LaForge and the three women left, Brett called Dana to tell her about what had just happened and told her she needed to fix the problem with Jackie. Malea then sent Jackie Dana's address through Facebook. At around 4:00 a.m. on April 27, 2020, Kristy drove Jackie and LaForge to Dana's apartment. LaForge and Jackie pounded on Dana's door, but she did not answer. LaForge and Jackie returned to Dana's apartment around 8:00 a.m. This time, Dana answered the door and spoke with Jackie and LaForge about the disputed meth transaction. After Dana explained her side of the story, the conversation

3

apparently ended amicably and Jackie and LaForge left. Dana messaged Brett, "Hey I squashed that problem with Crazy Native lady and her muscle" at 8:22 a.m., followed by "I apologise for that I hope that didn't do anything too fucked up they came and talked to me.. basically he agreed with[ me] on everything I had to say and fist bumped the end of the conversation…" at 8:27 a.m.

¶6 Later that day, LaForge was at the Lazy KT motel parking lot with his brother Sheldon LaForge, Kristy, and Garrett Door. Also in the parking lot was a car driven by Raisha Blacksmith. Raisha had driven up from Crow Agency with her friend Kally Ellsworth that morning to give James Fisher and Brian Pretty Weasel (known as "HP" for his resemblance to Harry Potter) a ride back to Hardin. Both James and HP were carrying guns—James a .40 caliber Springfield and HP a .45 caliber Smith and Wesson—and the party had just arrived back at the Lazy KT following a trip to the Vegas Hotel to buy drugs and find someone who owed HP money. HP got out of Raisha's car and spoke with LaForge. LaForge asked HP to back him up when he went to go collect money from someone who owed him. HP agreed, and the two cars—one driven by Kristy, with LaForge, Sheldon, and Garrett as passengers and the other driven by Raisha, with Kally, James, and HP as passengers—drove across Billings towards Brett's trailer. When the two cars got to Brett's trailer, Joseph was just pulling away, so they kept driving. The cars stopped at the end of the street, and HP, with his .45 caliber pistol, got out of Raisha's vehicle and into Kristy's car with LaForge.

¶7 Joseph noticed the two cars drive by while he was leaving, saw HP get out of one car and into the other, and called Brett to warn him the people who had been at the trailer

4

the day before may be back and that he should lock the door. Kristy and Raisha turned around and drove back to the trailer, stopping in front. LaForge, Sheldon, Garrett, and HP got out of Kristy's car and James got out of Raisha's car. The five men approached the trailer, with Sheldon and Garrett walking to the driveway, while LaForge, HP, and James went to the door. LaForge, now carrying HP's .45 caliber, started kicking the trailer door. Brett came out of the door holding a baseball bat. James, standing directly in front of Brett, raised and aimed his .40 caliber gun at Brett. Brett, noticing LaForge and HP to the side, turned towards them. LaForge shot Brett once in the head and the men scattered back to the cars. When he got back into Kristy's car, LaForge said, "Did you see that? He's dead. I fucking killed him." Brett's neighbors heard the gunshot and ran to the trailer after the cars sped away. Justin George discovered Brett facedown in a milk crate at the bottom of the stairs, found he still had a pulse, and had his business partner call 911. Paramedics arrived and took Brett to the hospital, where he died later that day. A .45 caliber shell casing was recovered at the scene.

¶8     On June 18, 2020, the State charged LaForge with Deliberate Homicide (with weapons enhancement) for shooting and killing Brett.[1] The Office of Public Defender (OPD) was assigned to represent LaForge, and OPD assigned attorney Robert Snively to

---

[1] James was charged with felony murder for Brett's death, and eventually entered into a plea agreement with the State where he pled guilty to assault with a weapon and agreed to testify at LaForge's trial in exchange for the State recommending a 20-year sentence with 10 years suspended. Raisha and Kristy were both charged with felony obstructing justice for their roles as getaway drivers following the shooting. Both entered into plea agreements whereby they would plead guilty and testify at LaForge's trial in exchange for the State recommending a sentence of 10 years, with 5 years suspended.

LaForge's case.[2]  At a December 11, 2020 status hearing, Snively informed the District Court that LaForge had refused to meet with him and the two were no longer communicating.  The court set a status of counsel hearing for December 14, 2020.  At that hearing, the District Court excused the State and heard LaForge's complaints about his counsel.  The court determined LaForge's complaints about Snively were not seemingly substantial as they were based on his misunderstanding of the legal system.  Nevertheless, the court "reluctantly" ordered OPD to appoint LaForge new counsel as it was apparent that LaForge was hostile towards Snively and would no longer work with him.  The District Court directly addressed LaForge and said:

> And I'm telling you, Mr. LaForge, that this is the only time I'm going to do this.  So if we are sitting in court here in another 60 to 90 days and you still have these same complaints, I'm not going to indulge them.
>
> What I am going to do, is I'm going to give you the opportunity to either proceed with the new counsel that's appointed for you, or to represent yourself; but what I'm not going to allow you to do is basically indulge your misunderstandings of the law and the evidence to delay these proceedings.

OPD filed a Notice of Reassignment of Counsel on December 21, 2020, assigning LaForge's case to attorney David Merchant.

¶9     The matter proceeded towards trial over the next several months, and the District Court held a Final Pretrial Conference on September 28, 2021, ahead of the trial set to begin on October 4, 2021.  On September 30, 2021, LaForge was recorded in jailhouse calls telling a woman named Edith Cane that he had cussed out his attorney and was

---

[2] In addition to the deliberate homicide case, OPD assigned Snively to represent LaForge in three other pending felony cases as well as a revocation matter.

planning on telling the District Court that his attorney was not prepared for trial on the morning of the opening day of trial. The State requested a status of counsel hearing, which the District Court held on October 1, 2021. At that hearing, the court excused the State and conducted an inquiry into LaForge's complaints about his counsel. Some of LaForge's complaints about Merchant echoed his earlier complaints regarding Snively, while he also stated Merchant had only visited him twice at the jail since being appointed (along with two additional visits by Merchant's investigator) and would miss appointments. Merchant, in responding to LaForge's complaints, noted he "would challenge" LaForge's complaints regarding missed appointments and believed he had sufficiently met with LaForge to be able to provide effective assistance of counsel but never directly stated exactly how many times he met with LaForge. Merchant addressed LaForge's other complaints and noted he was ready to go to trial on Monday and provide effective assistance of counsel. The District Court found there was not "any substantial basis for requesting new counsel," and denied LaForge's request.

¶10 The case went to trial beginning on October 4, 2021. Over the four-day trial, the jury heard the testimony of Billings Police Officer Mackenzie Unruh, Justin, Dana, Billings Police Officer Cash Anderson, Joseph, Malea, James, Kally, Kristy, Billings Police Detective David Raschkow, Billings Police Detective Denise Baum, Raisha, and Billings Police Detective Bethany Schwartz, as well as the videotaped deposition of Dr. Robert Kurtzman.[3]

---

[3] Garrett could not be located to be served with a subpoena to testify at trial, while Jackie was served with a subpoena but did not appear. HP, facing a pending federal charge of being a felon

7

¶11 After the close of testimony, the parties settled jury instructions. LaForge requested the District Court give his Proposed Instruction No. 2, modeled after a Federal Criminal Jury Instruction, which stated:

> You have heard testimony from K[r]isty Alden, Raisha Blacksmith and James Fisher who are co-defendants and Garrett Door, Kally Ellsworth and Jaqueline Medicine Horse who are accomplices. Their testimony was given in exchange for promises by the government that they either would not be prosecuted or would receive favorable treatment in their individual cases. Their guilty plea is not evidence against Mr. La[F]orge and you may consider it only in determining that witness's believability.
>
> For those reasons, in evaluating the testimony of K[r]isty Alden, Raisha Blacksmith, James Fisher, Garrett Door, Kally Ellsworth and Jaqueline Medicine Horse, you should consider the extent to which their testimony may have been influenced by this factor. In addition, you should examine the testimony of K[r]isty Alden, Raisha Blacksmith, James Fisher, Garrett Door, Kally Ellsworth and Jaqueline Medicine Horse with greater caution than that of other witnesses.

¶12 During the settling of instructions, LaForge noted he would request the instruction be given after deleting the references to Garrett, Kally, and Jackie as accomplices. The District Court refused to give LaForge's Proposed Instruction No. 2, finding:

> the concerns expressed in this instruction are already covered by other instructions that pretty thoroughly tell the jury what they are to look at and consider in weighing the testimony of witnesses.
>
> The [c]ourt is also concerned that it would be improper for the Judge to invade the province of the jury by instructing them to view certain witness testimony with greater caution, given that they are, under Montana law, the sole judges of witness credibility.
>
> So for those reasons, I will refuse number 2 even as amended.

---

in possession of a firearm, refused to take the stand without invoking his Fifth Amendment rights and was not called as a witness by either the State or the Defense at trial.

The District Court did give several instructions related to the credibility of witness testimony, including the pattern instruction MCJI 1-103, given as Instruction No. 5, which directs jurors to "carefully consider all the testimony given, the circumstances under which each witness has testified, and every matter in evidence that tends to indicate whether a witness is worthy of belief" as well as "[w]hether the witnesses have an interest in the outcome of the case or any motive, bias or prejudice." Instruction No. 13 instructed the jury regarding the believability and weight of a witness's testimony. Instruction No. 14 instructed the jury that testimony about LaForge's unrecorded confession (to Kristy when he returned to the car following the shooting) "should be viewed with caution." And Instruction No. 15 specifically addressed the testimony of James:

> Testimony has been presented that the witness James Fisher may be legally accountable for the offense of Deliberate Homicide. In this respect, you are to be guided by the following rules of law:
>
> 1. A person is legally accountable for the conduct of another when: either before or during the commission of an offense with the purpose to promote or facilitate the commission, the person solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense.
>
> 2. It is a question of fact for the jury to determine from the evidence and from the law as given you by me whether or not in this particular case the witness, James Fisher, is or is not legally accountable within the meaning of the law.
>
> 3. The testimony of one legally accountable ought to be viewed with distrust.
>
> 4. A conviction cannot be had on the testimony of one legally accountable unless the testimony is corroborated by other evidence that in itself and without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the

9

commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

During closing arguments, counsel for LaForge argued the testimony of James, Kristy, and Raisha should be viewed with distrust as they had gotten deals from the State in exchange for their testimony and asserted that HP, not LaForge, was the actual shooter of Brett. After a short deliberation, the jury found LaForge guilty of deliberate homicide.

¶13 The District Court held a sentencing hearing on May 23, 2022. Prior to the hearing, Anita Ness, Brett's mother, had submitted a Victim's Affidavit in Support of Financial Loss, asserting she suffered a total pecuniary loss of $76,861—$5,785 in expenses due to the funeral home, less $3,500 paid by the Crime Victim Compensation Program, for a total of $2,285 in expenses due to the funeral home; $2,546 in expenses due to the cemetery; and $72,000 in lost income to her husband's business. At the sentencing hearing, Anita was questioned by the State regarding her loss of income claim:

> Q. And when you filled out the affidavit, it's broken down into a couple of different areas. I'm going to go through each of those areas with you. As far as any loss of income, could you tell the court about that?
>
> A. Well, the loss of income part is due to the fact of the type of work that my husband's company does. Part of it is log home restoration, and Brett was our foreman on those crews; and when he was murdered, we weren't able to do those jobs because we didn't have enough employees, so we had to either cancel them or reschedule them. So we -- that's why we have a loss of income for that amount.
>
> Q. And what amount are you seeking, as far as loss of income goes?
>
> A. 72,000.
>
> Q. Was there a certain, if you recall, number of jobs that you had to reschedule or get cancelled; or just so the [c]ourt has information about that.

10

A. I think it was like three or four jobs.

Q. And is there a figure that you use to estimate the 72,000?

A. Um, I'm sure there was; but I can't recall what it is.

Q. Okay. So the 72,000 was for at least four jobs that you had to have rescheduled?

A. Yes.

Anita explained that Brett was the foreman for her husband's company's log home restoration business and that the business had not sought out or trained another person to take over his position in the 25 months since Brett's death. The Nesses other son, CJ, who also worked at the company, had largely taken over Brett's responsibilities. The State's questioning continued:

Q. Anita, as part of that 72,000, did you suffer from any loss of income as a result of what happened to Brett?

A. Um, yeah. That was -- you know, that income was the amount that, you know, Chad and I would have shared with our partner; so it was a big hit for us.

LaForge's counsel then cross-examined Anita regarding the $72,000 loss of income figure:

Q. So the $72,000 for the loss of income is just kind of out there; and what you have now testified to, and I didn't know before five minutes ago what the 72,000 was for, so I've got a couple of questions for you. You've indicated that that is the amount of loss because of cancelled or delayed projects. Correct?

A. Yes.

Q. And you thought it was three or four?

A. Yes.

Q. And it's fair to say that this happened April 27th of 2020. Correct?

11

A.  Uh-huh.  Yes.

Q.  That's 25 months ago.  Correct?

A.  Right.

Q.  Okay.  So, is it three or is it four?

A.  It's probably -- it was four.

Q.  Okay.  Do you have any paperwork that says: We had to cancel this order?

A.  No.

Q.  Okay.  Do you have any paperwork that says people paid you money and then you had to refund that money?

A.  No.

.   .   .

Q.  Okay.  So there's no actual out of loss -- out-of-pocket money; this is potentially lost money?

A.  Yes.

Q.  Okay.  But you don't know, were those cancelled or were they just delayed?

A.  Well, I believe we cancelled them because we didn't know when we could hire somebody to be able to replace Brett.

Q.  Okay.  Do you know if any of those four or three have been reordered?

A.  I do not know that.

.   .   .

Q.  Okay.  Do you have corporate tax returns that would show that in 2019 there were 10 restoration jobs, and in 2020 there were only three or four?

A.  I'm sure that I do; yes.

12

Q. Okay. But did you provide any of that to the State?

A. No, because I wasn't told I had to.

Q. Okay. So you just put a number down?

A. I put a [number] down based on the jobs that we missed out on.

Q. Okay. So that means that there's -- that number comes from a specific place. So I need you to -- we just need to root this out of what it's out of. So how much of the three or four jobs that were lost, so each job is worth $15,000?

A. Yes, at least.

. . .

Q. Well, when you said that there were four now, there's three. I'm curious if he's one of those. Again, I'm not trying to be -- I'm just trying to find out why this number 72 comes up, and there still isn't any rhyme or reason to it. What is the actual -- so, you don't have any cancellation paperwork where you have refunded money?

A. No.

Q. And you may have tax returns, but you have never been asked for those?

A. No.

Q. No, you've never been asked or --

A. I've never been asked.

Q. But you do have tax returns?

A. Yes, I have tax returns.

Counsel for LaForge informed the District Court that he agreed with the restitution requests Anita made for the funeral home and cemetery, but was contesting the $72,000 loss of income request because "at this point there's no verification or proximate cause as to the

13

72,000, and I would ask the [c]ourt to do one of two things. It can deny it today, which probably isn't fair because she hasn't been asked to provide those things, but hold this off for 30 or 60 days so that they can provide some more verification to the restitution request." The District Court imposed the full $72,000 loss of income restitution request, finding "I believe that there was sufficient evidence presented for the loss income of $72,000. We had a representative of the company here. There was -- it's pretty clear to the [c]ourt that she had sufficient knowledge to talk about lost jobs and lost income and what that would be. She had a basis of knowledge for that." The court further noted that "this was the amount of restitution that was ordered in other cases involving the co-defendants; and I believe that under these circumstances, with the witness who was in a position to have personal knowledge of what these losses would be, and knowing that Mr. Ness, Brett Ness, was in a position of responsibility and had specialized knowledge in terms of log home restoration, that his sudden loss would be expected to result in a loss of income to the company." The District Court orally sentenced LaForge to 100 years at the Montana State Prison (MSP), with a 50-year parole restriction, for deliberate homicide, along with a 10-year consecutive MSP sentence for the weapons enhancement charge. The court's written Judgment was filed on June 28, 2022.

¶14 LaForge appeals. Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶15 A criminal defendant's request to substitute counsel is within the sound discretion of the district court and is reviewed for abuse of discretion. *State v. Patina*, 2024 MT 257, ¶ 8, 418 Mont. 523, 558 P.3d 799 (citing *State v. Aguado*, 2017 MT 54, ¶ 8, 387 Mont. 1,

14

390 P.3d 628). A district court abuses its discretion when it acts arbitrarily, without conscientious judgment or in excess of the bounds of reason resulting in substantial injustice. *State v. Walla*, 2025 MT 42, ¶ 7, 421 Mont. 11, 564 P.3d 850.

¶16 We review a district court's decisions regarding jury instructions for an abuse of discretion. *State v. Kalina*, 2025 MT 70, ¶ 30, 421 Mont. 305, 567 P.3d 270 (citing *State v. Fredericks*, 2024 MT 226, ¶ 11, 418 Mont. 220, 557 P.3d 32). "Our review considers 'whether the instructions, taken as a whole, fully and fairly instructed the jury on the law applicable to the case.'" *Fredericks*, ¶ 11 (quoting *State v. Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 429, 204 P.3d 7). Any mistakes in instructing the jury are considered reversible error only if they "prejudicially affected the defendant's substantial rights." *State v. Reynolds*, 2017 MT 25, ¶ 36, 386 Mont. 267, 389 P.3d 243 (citing *Cybulski*, ¶ 34).

¶17 Restitution awards present a mixed question of law and fact, which we review de novo. *State v. Cleveland*, 2018 MT 199, ¶ 7, 392 Mont. 338, 423 P.3d 1074 (citing *State v. Dodge*, 2017 MT 318, ¶ 6, 390 Mont. 69, 408 P.3d 510). We review the appropriateness of imposing restitution for correctness and the district court's findings regarding the amount of restitution to determine whether they are clearly erroneous. *Cleveland*, ¶ 7 (citing *State v. Patterson*, 2016 MT 289, ¶ 9, 385 Mont. 334, 384 P.3d 92). A finding of fact is clearly erroneous if it is not supported by substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been made. *State v. Ailer*, 2018 MT 18, ¶ 10, 390 Mont. 200, 410 P.3d 964 (citation omitted).

**DISCUSSION**

¶18    *1. Whether the District Court abused its discretion by denying LaForge's request for substitution of counsel.*

¶19    LaForge asserts the District Court abused its discretion by denying his request to substitute attorney Merchant during the October 1, 2021 hearing. LaForge contends there was a complete breakdown in communication with his attorney which entitled him to new counsel. The State responds that the District Court correctly determined LaForge did not set forth grounds establishing good cause to justify substituting counsel.

¶20    Both the United States Constitution and the Montana Constitution guarantee a criminal defendant the right to effective assistance of counsel. U.S. Const. amend. VI; Mont. Const. art. II, § 24. "[A] defendant is entitled to substitute counsel if he presents material facts showing good cause for the substitution as demonstrated by: (1) an actual conflict of interest; (2) an irreconcilable conflict between counsel and the defendant; or (3) a complete breakdown in communication between counsel and the defendant." *State v. Johnson*, 2019 MT 34, ¶ 19, 394 Mont. 245, 435 P.3d 64. A trial court is required "to perform an 'adequate initial inquiry' to determine whether the defendant's complaints are 'seemingly substantial' when considering a defendant's request for substitute counsel." *Johnson*, ¶ 21 (collecting cases). "A district court's inquiry is adequate if it considers a defendant's factual complaints together with counsel's specific explanations addressing the complaints." *Johnson*, ¶ 22 (collecting cases). If the trial court performs an adequate initial inquiry and determines a defendant's complaints are not seemingly substantial, it does not need to conduct a hearing to address the complaint. *Johnson*, ¶ 22.

16

¶21 Here, the District Court conducted an adequate initial inquiry into LaForge's complaints about his counsel. LaForge alleged Merchant would not file motions related to his arrest in Big Horn County; that he was just receiving discovery in the form of witness statements and Facebook documents; and that Merchant did not meet with him enough times and missed appointments. The District Court addressed each of these complaints with Merchant in its initial inquiry and received his explanations. During the inquiry, it became clear that LaForge's complaints regarding Merchant not filing motions related to his arrest (the same motions attorney Snively also refused to file because they would be frivolous) stemmed from LaForge's misunderstanding of the legal system; that discovery was being promptly provided, but witness statements were just coming in as the co-defendants (James, Kristy, and Raisha) had just agreed to plea agreements and to give statements; and that Merchant "challenged" LaForge's characterization of him "missing appointments." The District Court did not specifically ask, nor did Merchant volunteer, exactly how many times either he or his investigator met with LaForge at the jail. Merchant explained that he was prepared to give effective assistance of counsel to LaForge at trial.

¶22 LaForge did not, and does not, allege there was either an actual conflict of interest or an irreconcilable conflict between counsel and himself, so he was required to show "a complete breakdown in communication between counsel and the defendant" to be entitled to substitute counsel. *Johnson*, ¶ 22. A complete breakdown in communication with counsel is shown when "communication becomes so compromised that mounting a defense is impossible[.]" *Patina*, ¶ 10 (citing *Johnson*, ¶ 18). Following the District Court's initial inquiry, it was not presented with evidence showing a seemingly substantial breakdown in

17

communication between LaForge and Merchant, but simply a defendant frustrated with his attorney and concerned he would be unable to review the evidence and prepare for trial. "A defendant may not demand substitute counsel simply because he lacks confidence in, or does not approve of, his counsel[.]" *Johnson*, ¶ 14. After the District Court considered Merchant's explanations regarding LaForge's complaints in its initial inquiry, "[w]hat remained was only vagary and a general feeling that counsel's performance was unsatisfactory or ineffective—arguments that we have expressly held are not grounds for substitution of counsel." *Patina*, ¶ 13.

¶23 We also note that the trial court is required to consider "the timeliness of the motion" to substitute. *Johnson*, ¶ 23. Here, LaForge made the request to substitute counsel on October 1, 2021, the Friday before his trial was to begin on October 4, 2021—and even then, only after repeatedly demurring when directly asked by the District Court multiple times at that hearing whether he was in fact asking to substitute counsel. The October 1, 2021 hearing also only came about because the State overheard LaForge explaining his plan to tell the District Court his attorney was not ready for trial on the opening day of trial. Such a last-minute request is "problematic," *Johnson*, ¶ 29, which the District Court recognized, noting it was considering the timeliness of the motion and "very well under[stood] what the history of this case has been."

¶24 Finally, much of LaForge's appellate argument focuses on Merchant not asking for a continuance after the District Court denied LaForge's request to substitute counsel. The District Court made clear it would not consider a continuance requested by LaForge himself, but would "listen to very carefully" a motion to continue made by Merchant if he

18

believed he had a basis to continue the trial so he could do additional work based on the late production of material. Merchant, who had already explained he was ready to provide effective assistance of counsel at the trial set to begin three days later during the District Court's initial inquiry into LaForge's complaints, did not request a continuance. This colloquy regarding a continuance both took place after the District Court had already determined LaForge's complaints were not seemingly substantial and denied his request for substitution of counsel and did nothing to show the court's ruling there was not a "complete breakdown in communication" between LaForge and Merchant was incorrect. Moreover, as it occurred after the District Court had already ruled on LaForge's request, it is essentially irrelevant to our review of the District Court's actions in this case.

¶25 In this case, the District Court properly conducted an initial inquiry, determined that LaForge's grievances with Merchant did not rise to the level of a "seemingly substantial" complaint showing a complete breakdown in communication, and exercised its discretion to deny LaForge's last-minute request for substitute counsel. *See Patina*, ¶ 14.

¶26 *2. Whether the District Court abused its discretion in instructing the jury regarding a co-defendant's testimony.*

¶27 LaForge asserts a cautionary instruction regarding the testimony of Kristy was required because her testimony was incentivized due to her plea agreement with the State and the jury should have been told to view her testimony with greater caution than that of other witnesses. The State asserts the jury was both properly instructed by the District Court and that, even if there was any error in instructing the jury, such was harmless due to the strength of the evidence presented at trial. We agree with the State that the

19

instructions given by the District Court fully and fairly instructed the jury, and we need not reach the State's alternative argument regarding the strength of the evidence.

¶28 LaForge initially proposed an instruction which would instruct the jury to view the testimony of Kristy, James, Raisha, Garrett, Kally, and Jackie "with greater caution than that of other witnesses." During the settling of jury instructions, LaForge pared his request back to only Kristy, James, and Raisha. On appeal, LaForge now only asserts the District Court abused its discretion by not instructing the jury to view Kristy's testimony with greater caution than other witnesses.[4] LaForge asserts such an instruction is required based on this Court's decision in *State v. Grimes*, 1999 MT 145, 295 Mont. 22, 982 P.2d 1037.

¶29 In *Grimes*, we addressed testimony by "jailhouse informants" and incorrectly stated that "Montana ha[d] no prior case law addressing cautionary instructions for 'jailhouse informants.'" *Grimes*, ¶ 43. Looking to federal cases, we held "that when a government informant motivated by personal gain rather than some independent law enforcement purpose provides testimony, a cautionary instruction is the more prudent course of action." *Grimes*, ¶ 45. In *State v. DuBray*, 2003 MT 255, 317 Mont. 377, 77 P.3d 247, we noted our misstatement regarding Montana's lack of prior caselaw addressing cautionary instructions for "jailhouse informants" in *Grimes* and noted we had in fact previously addressed the issue in cases such as *State v. Long*, 274 Mont. 228, 907 P.2d 945 (1995), and its predecessors. *DuBray*, ¶ 92. In both *Long* and *DuBray*, the trial courts gave the

---

[4] As previously noted, the District Court did specifically instruct the jury regarding James's testimony and that it "ought to be viewed with distrust" if the jury believed he was legally accountable for Brett's death.

pattern witness credibility instructions, which this Court determined "adequately addressed witness motive, bias or prejudice, and bad character for truthfulness." *DuBray*, ¶ 92 (quoting *Long*, 274 Mont. at 234, 907 P.2d at 949). Notwithstanding our minor detour in *Grimes*, we have continued to follow the *Long/DuBray* holdings to find that the pattern witness credibility instructions instruct the jury "to determine the credibility of each informant, including their knowledge, how they gained that knowledge, their self-interest, criminal records, the extent to which each witness was 'supported or contradicted by other evidence,' and to view testimony about [a defendant's] unrecorded confessions and admissions with caution." *State v. Hardy*, 2023 MT 110, ¶ 44, 412 Mont. 383, 530 P.3d 814. The credibility instructions "specifically direct[]" the jury "to subject critical portions of [an informant's] testimony to greater scrutiny." *Hardy*, ¶ 44.

¶30 Here, the District Court's Instruction Nos. 5, 13, 14, and 15 specifically addressed witness credibility via pattern instructions in the manner we have repeatedly determined fully and fairly instruct the jury as to the applicable law regarding informant and/or incentivized testimony. *See, e.g., DuBray*, ¶ 90; *Hardy*, ¶ 44. "Where the proposed instruction is adequately covered by a given instruction, it is not error for the trial court to refuse the proposed instruction." *Long*, 274 Mont. at 234, 907 P.2d at 949 (citing *State v. Floyd*, 243 Mont. 269, 275, 790 P.2d 475, 479 (1990)). LaForge's oral confession to Kristy was also specifically addressed in Instruction No. 14, where the jury was instructed that Kristy's testimony regarding LaForge's unrecorded confession "should be viewed with caution." In addition to the proper credibility instructions being presented to the jury, Kristy was also subjected to thorough cross-examination regarding her deal with the State

21

to give testimony in exchange for a lesser sentence and LaForge again referenced the incentivized testimony during his closing argument. The jury was "made aware of facts concerning the credibility of" those witnesses who were testifying in exchange for promises regarding their sentences by the State—Kristy, James, and Raisha—and received the proper instruction from the District Court "on how to consider those facts." *Hardy*, ¶ 47. Taken as a whole, the jury instructions fully and fairly instructed the jury as to the applicable law and the District Court's refusal to give LaForge's Proposed Instruction No. 2 was not an abuse of discretion.

¶31   *3. Whether the District Court erred when it ordered $72,000 in restitution to the victim's mother for loss of profits to her husband's business.*

¶32   The final issue on appeal concerns Anita's request for $72,000 in restitution for loss of income to her husband's business. LaForge asserts the "evidence of losses was inadequate to sustain a $72,000 restitution award." The State contends Anita's testimony provided sufficient evidence to support the award and therefore the District Court's findings based on that testimony were not clearly erroneous.

¶33   A district court's factual findings as to the amount of restitution owed will be disturbed on appeal only if they are clearly erroneous. *State v. Aragon*, 2014 MT 89, ¶ 9, 374 Mont. 391, 321 P.3d 841. A finding of fact is clearly erroneous if it is not supported by substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been made. *Ailer*, ¶ 10. Substantial evidence is evidence that a reasonable person could accept as sufficient to support a conclusion. *State v. Jent*, 2013 MT 93, ¶ 10, 369 Mont. 468, 299 P.3d 332 (citing *Johnston*

22

*v. Palmer*, 2007 MT 99, ¶ 26, 337 Mont. 101, 158 P.3d 998). Substantial evidence "consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Jent*, ¶ 10.

¶34 "Upon sentencing in a criminal case, courts must require defendants to pay restitution in an amount sufficient to fully compensate victims for all pecuniary loss substantiated by record evidence to have been caused by the defendant's criminal conduct." *State v. Pierre*, 2020 MT 160, ¶ 12, 400 Mont. 283, 466 P.3d 494 (citing §§ 46-18-201(5), -241(1), and -243(1), MCA). "Restitution engrafts a civil remedy onto a criminal statute, creating a procedural shortcut for crime victims who would be entitled to a civil recovery against the offender." *Jent*, ¶ 12 (citing *State v. Brownback*, 2010 MT 96, ¶ 19, 356 Mont. 190, 232 P.3d 385). Even when actual losses are uncertain, they may be recoverable if they are calculated by use of reasonable methods based on the best evidence available under the circumstances. *State v. Simpson*, 2014 MT 175, ¶ 14, 375 Mont. 393, 328 P.3d 1144 (citation omitted). "Reasonable methods include 'a reasonably close estimate of the loss.'" *Simpson*, ¶ 14 (quoting *State v. Dodson*, 2011 MT 302, ¶ 12, 363 Mont. 63, 265 P.3d 1254). "Nothing in the controlling restitution statutes . . . requires a court or a victim to substantiate a restitution calculation with documentation" and the sentencing court may rely on victim testimony presented at the sentencing hearing. *State v. McMaster*, 2008 MT 268, ¶ 29, 345 Mont. 172, 190 P.3d 302. "However, while a victim's affidavit or her testimony may be sufficient, if credited by the court, to support an award of restitution, we have also rejected restitution where the evidence before the court was insufficient to support the amount awarded." *Aragon*, ¶ 14. "The victim of a criminal act has a duty to mitigate

23

restitution damages. However, this duty is limited; an injured person is not expected to do what is unreasonable or impracticable." *State v. Brave*, 2016 MT 178, ¶ 9, 384 Mont. 169, 376 P.3d 139 (internal citation omitted).

¶35   "The law entitles injured parties at a criminal sentencing hearing to restitution for 'pecuniary loss,' but pecuniary loss is defined to include only those 'special damages . . . that a person could recover against the offender in a civil action[.]'" *State v. Santoro*, 2019 MT 192, ¶ 23, 397 Mont. 19, 446 P.3d 1141 (*Santoro I*) (quoting § 46-18-243(1)(a), MCA. "Pecuniary loss" may include "out-of-pocket losses, such as medical expenses, loss of income, expenses reasonably incurred in obtaining ordinary and necessary services that the victim would have performed if not injured, expenses reasonably incurred in attending court proceedings related to the commission of the offense, and reasonable expenses related to funeral and burial or crematory services." Section 46-18-243(1)(a), MCA. Pursuant to the restitution statutes, the District Court is required to impose a restitution "amount sufficient to fully compensate" Anita "for all pecuniary loss substantiated by record evidence to have been caused by the defendant's criminal conduct." *Pierre*, ¶ 12. "The State has the burden of proving the requisite causal connection or criminal accountability for restitution in any event." *Pierre*, ¶ 13 (collecting cases). When presented with differing estimates, a district court is "required to make a determination as to what amount of restitution was supported by a preponderance of the evidence." *Aragon*, ¶ 16. Importantly, "[r]estitution is a civil remedy, not a criminal punishment, which may not be ordered for damages not recoverable in a civil action."

24

*Santoro I*, ¶ 23 (citing *State v. McClelland*, 2015 MT 281, ¶ 10, 381 Mont. 164, 357 P.3d 906).

¶36    Brett's mother, Anita, broadly falls under the statutory definition of victim in this case. *See* § 46-18-243(2)(a)(ii), MCA (defining "victim" as "a member of the immediate family of a homicide victim"). But she, as representative of the log home business, was also Brett's employer, which the District Court emphasized when granting her restitution request—the court noted she was "a representative of the company" and found Brett's death "would be expected to result in a loss of income to the company." While a family *member* of someone killed in a deliberate homicide is a victim pursuant to the restitution statutes, it is far from certain that a family *business* could be considered such. *See* § 46-18-243(2), MCA. On the record before us, it is somewhat unclear whether the District Court ordered restitution to Anita individually or to Anita as an agent of the business to compensate *the business* for its (prospective) losses of profit from the surplus value of Brett's labor as foreman. "The purpose of the restitution statutes is to ensure that victims are made whole in relation to any pecuniary losses incurred due to the defendant's criminal activity *to the extent such losses could be recovered in a civil action*." *State v. Lamb*, 2021 MT 302, ¶ 12, 406 Mont. 368, 498 P.3d 1252 (citing §§ 46-18-241, -243, MCA) (emphasis added). We therefore determine it is necessary to remand for a hearing to determine whether Anita is a "victim" under the restitution statutes when she appears as an agent of a business, co-owned with a non-family member, which employed the deceased. The business can only be considered a victim eligible to recover its pecuniary

25

losses if it is determined that business could bring and win a civil case against LaForge for Brett's death.[5] *Lamb*, ¶ 12.

¶37     We further note that Anita's testimony at the sentencing hearing regarding the $72,000 amount stated, "that income was the amount that, you know, Chad and I would have shared with our partner; so it was a big hit for us."  Anita's Affidavit in Support of Financial Loss declared that "I have suffered" a pecuniary loss as a result of LaForge's actions.  Neither Chad nor the unnamed business partner filed affidavits of pecuniary loss, and the unnamed business partner of a homicide victim's parents is certainly far too attenuated to be considered a "victim" under the restitution statutes.  *See* § 46-18-243(2), MCA.  The record is unclear as to what exactly Anita's role in the business is as she testified it was her husband's business but then also testified as if she perhaps had some ownership interest in it.  The record is devoid of the business structure, at times referred to as a family business and at other times a company, co-owned with a non-family member with separate corporate tax returns.  The District Court failed to analyze whether Anita, as a representative of the business, meets the statutory definition of a "victim."

---

[5] Typically, an employer has no civil cause against a third-party tortfeasor for lost profits based on the tortfeasor injuring the employee during off duty hours in activities not related in any manner to the employee's employment. *See, e.g., Cont'l Cas. Co. v. P.D.C., Inc.*, 931 F.2d 1429, 1430-31 (10th Cir. 1991) (collecting cases rejecting the proposition that an "employer faced with the lack of work force due to employee injury has a cause of action against the one responsible for the injury" and detailing the nearly-universal rejection of the common law principle of *per quod servitium amisit* by courts in the United States). "[E]mployers cannot rely on master/servant liability to assert an interest in their employees. Master/servant liability, which has been roundly rejected, posits that an employer has a proprietary interest in his employee's services. Modern caselaw views the doctrine as asserting a proprietary interest in an employee himself, which is regarded as an unacceptable premise." *Cantor Fitzgerald & Co. v. Am. Airlines, Inc. (In re September 11 Litig.)*, 760 F. Supp. 2d 433, 442 (S.D.N.Y. 2011) (internal citation omitted).

¶38    In addition to the need to remand for a determination of whether Anita, as an agent of the business, suffered a pecuniary loss which is recoverable under the restitution statutes based upon alleged damage to the business due to Brett's death, we further determine the District Court erred by imposing $72,000 in lost income to Anita because the award was not supported by substantial evidence presented at the sentencing hearing. Anita's affidavit of pecuniary loss provided no detail for the $72,000 figure beyond the description "[l]oss of income due to Brett's death." When testifying at the sentencing hearing, Anita was unable to recall how she came to the $72,000 figure. She testified that "like three or four jobs" either had to be rescheduled or canceled, but was unsure of how many jobs were affected and whether they were rescheduled—which would lead to no loss of income—or were in fact canceled. Upon cross-examination, Anita stated she believed "probably" four jobs were canceled, but did not know if any of them had been reordered—crucial information for determining whether there was an actual loss of income suffered in this case. Further, Anita testified that there had been no effort made to recruit, hire, or train a new foreman to replace Brett in the 25 months following his death outside of CJ, who already worked for the business, taking on some responsibilities. As a victim has a duty to mitigate restitution damages, *Brave*, ¶ 9, should the District Court determine Anita is entitled to restitution for business losses, the District Court must also consider reduction of the loss based on the duty to mitigate.

¶39    On this record, there is not substantial evidence to support the $72,000 loss of income award and the District Court's finding otherwise is therefore clearly erroneous. While we reiterate that a victim is not required to support a restitution request with

27

documentation, *McMaster*, ¶ 29, the victim's testimony regarding a restitution figure must still be sufficient to support the amount awarded. *Aragon*, ¶ 14. Anita's testimony, which was unclear as to the structure of the business, her role in the business, the amount of jobs affected, whether those jobs were canceled or rescheduled, and whether any canceled jobs had since been reordered by the customer, did not present sufficient evidence to support the District Court's restitution award. "Assumptions, ballpark figures from friends, and purely speculative calculations are insufficient information upon which to make findings of fact." *State v. Coluccio*, 2009 MT 273, ¶ 45, 352 Mont. 122, 214 P.3d 1282, *overruled, in part, on other grounds by State v. Kirn*, 2012 MT 69, ¶ 8 n.1, 364 Mont. 356, 274 P.3d 746.

¶40     Based on the foregoing, we remand to the sentencing court to conduct a new hearing in accordance with this Opinion. *Aragon*, ¶ 21; *see also Coluccio*, ¶ 46.

## CONCLUSION

¶41     The District Court did not abuse its discretion by denying LaForge's request to substitute counsel or when instructing the jury. The District Court did err, however, by ordering $72,000 in restitution to Anita without sufficient evidence of actual loss of income to Anita as a "victim" under the restitution statutes. That portion of the restitution award is reversed, and we remand for a new restitution hearing consistent with this Opinion.

¶42     Affirmed in part, reversed in part, and remanded.

/S/ INGRID GUSTAFSON

28

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M BIDEGARAY
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE